# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-2028

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| Arlene Marie Frokjer, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: December 15, 2004
Filed: July 20, 2005

_____

Before WOLLMAN, LAY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Following a jury trial, Arlene Marie Frokjer was found guilty of twelve counts of making false statements to obtain federal employees' compensation, in violation of 18 U.S.C. § 1920, and two counts of wire fraud, in violation of 18 U.S.C. § 1343. The district court[1] sentenced Frokjer to fifteen months' imprisonment and ordered her to pay $97,791.38 in restitution. We affirm.

_____

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

Frokjer began working as a clerk in the United States Post Office Bulk Mail Center ("BMC") in Eagan, Minnesota in April 1991. Her duties included sorting mail and entering data, first during the night shift and later during the day. From January 2001 to April 2001, the BMC replaced the "towline," a moving track embedded in the floor that assisted postal workers in moving containers. During this period, postal workers moved the mail manually on carts, and this required greater physical effort.

On June 28, 2001, Frokjer visited Dr. Naheed Ali and complained of work-related bilateral arm pain. On July 11, 2001, she filed a "Notice of Occupational Disease and Claim for Compensation" with the Postal Service Injury Compensation Office, claiming myalgia of her left and right arms. The Injury Compensation Office forwarded Frokjer's claim to the Department of Labor's Office of Workers' Compensation Programs in Chicago for adjudication. That office accepted her claim and began paying benefits.

Following consultation with several medical specialists, Frokjer was referred to the Medical Advanced Pain Specialists clinic in late 2001. She continued her treatment there until approximately October 2002. During the course of her treatment, Frokjer underwent a functional capacity examination to determine her physical capabilities.

Frokjer accepted a limited duty assignment at the Post Office beginning on July 12, 2001. The government introduced attendance records indicating that Frokjer stopped working on July 14, 2001, and did not return to work until February 2002. The government's evidence indicated that Frokjer worked intermittently upon her return. Sherry Constans, the manager of the Injury Compensation Office in St. Paul, testified that the Post Office offered Frokjer a series of job positions with increasingly fewer physical demands, including ultimately an assignment limited entirely to sitting

at a desk answering a telephone. Constans testified that the Post Office also purchased a special ergonomic chair to help alleviate Frokjer's pain.

The government introduced evidence that fraud analysts from the United States Postal Service conducted surveillance of Frokjer from October 2001 through August 20, 2002. They observed Frokjer covertly and videotaped her activity. Postal inspectors also recorded telephone conversations between Frokjer and the Injury Compensation Office during this period.

A grand jury eventually charged Frokjer with thirteen counts of providing a false statement to obtain federal employees' compensation. The indictment alleged that she falsely made claims of work-related injuries to the Postal Service in July 2001, from July 13 to August 9, 2002, and in November 2002. The indictment further charged that she made false statements concerning her physical limitations and medical condition to health care providers on various dates between November 2001 and August 2002. The grand jury also charged two counts of wire fraud for direct compensation and medical benefits, respectively, based on schemes to defraud continuing from July 11, 2001 through June 6, 2003. Following a six-day trial in November 2004, the jury convicted Frokjer on both counts of wire fraud and all but one of the false statement charges. The district court denied Frokjer's motion for a downward departure from the otherwise applicable (and then-mandatory) sentencing guideline range, and sentenced Frokjer to fifteen months' imprisonment. In addition, Frokjer was ordered to pay $97,791.38 in restitution and a $1400 special assessment.

II.

Each count of conviction was premised on a finding that Frokjer knowingly made a false statement to obtain compensation for purported work injuries that prevented her from working. Frokjer contends that the evidence was insufficient to prove that her statements were false and that she knew of their falsity. She asserts

that the government's primary evidence – surveillance videos of Frokjer engaging in everyday activities such as lifting grocery bags, opening car doors, and moving bulky objects into the back of a truck – does not demonstrate the falsity of her statements that she was unable to work.

Frokjer contends that because a functional capacity examination conducted in January 2002 indicated that Frokjer, on rare occasions, could exert herself so as to push, pull, or lift heavier weights, the instances in which she was observed in physical activity do not necessarily contradict her statements that she was unable to work full-time. She argues that because the videos do not show her engaging in the strenuous tasks repetitively, and because there was no direct testimony that she did so, no reasonable jury could find false her assertions of inability to perform repetitive job duties. She also argues that she *believed* in the truth of her statements that she was unable to work, because she had been told many times by various doctors that she was injured.

When reviewing the sufficiency of the evidence in support of a jury verdict, we view the evidence in the light most favorable to the verdict, accepting all reasonable inferences drawn from the evidence that support the verdict. Circumstantial evidence by itself can be sufficient to support a verdict of guilty, and we will not reverse a conviction unless no reasonable jury could find the defendant guilty beyond a reasonable doubt. *United States v. Simon*, 376 F.3d 806, 808 (8th Cir. 2004).

The government argues that ample circumstantial evidence supported the jury's conclusion that Frokjer knowingly made false statements, and we agree. Dr. David Nelson testified that, based on his viewing of surveillance videotape, he believed that Frokjer made misrepresentations about her physical capacities to him and his colleagues while they were treating her. Ronda Marie Thompson, a nurse practitioner at the clinic, offered a similar assessment. Fraud analyst Gary Barth testified that over the course of his surveillance of Frokjer, he observed that she was "a healthy,

active woman doing normal functions without any sign of any kind of pain or discomfort."

Frokjer admitted that on March 14, 2002, she went to Sam's Club and purchased a 50-pound container of laundry detergent and a bag of ice melt salt that a fraud inspector testified weighed 40 pounds. Surveillance video indicated that she loaded them into her car herself. Frokjer called the Post Office on July 11, 2002, claiming she was unable to work, but surveillance video showed that during a trip to Cub Foods on that same date, she purchased two two-gallon milk jugs and several bags of groceries, which she loaded into her car herself. The jury heard recordings of phone calls Frokjer made to the Injury Compensation Office during August 2002 in which she claimed various physical ailments, but also viewed surveillance video, from other dates in July and August 2002, which showed Frokjer engaged in everyday activities such as opening and closing car doors and trunks, loading groceries into her car, and moving objects from her sister's garage to the back of a truck.

The manager of the USPS Injury Compensation Office, Sherry Lee Constans, testified that Frokjer was uncooperative in providing the office with information and in working to find an appropriate limited-duty job. Frokjer's daughter testified that Frokjer found her job answering telephones boring, and her husband conceded that it was not pain that kept Frojker from working at her job answering the phone, but rather her boredom with that job.

This evidence was sufficient to support Frokjer's conviction. The jury could reasonably have inferred from this evidence, particularly from Frokjer's physical activity, her lack of cooperation with the Injury Compensation Office, and her doctor's testimony about the dissonance between her reported symptoms and the activities in which she was engaged while under surveillance, that Frokjer knew that the statements she made to the Post Office and her medical providers regarding her physical limitations and medical condition were false. The jurors also heard Frokjer

testify, so they were able to make their own determination of her credibility. We conclude that a reasonable jury could return the verdicts of guilty.

## III.

Frokjer argues that even if the evidence was sufficient, the district court abused its discretion in admitting a videotape that depicted events occurring between July 11 and August 19, 2002. The disputed videotape was a composite of surveillance video footage and excerpts of audiotaped phone calls that Frokjer made to the Postal Service Injury Compensation Office. Frokjer argues that because the audio and video portions of the tape were recorded at different times, but then presented simultaneously through an audio overlay on the videotaped segments, the juxtaposition of the audio and video portions likely misled and confused the jury. She contends that the probative value of the evidence was substantially outweighed by danger of unfair prejudice, such that the videotape should have been excluded under Federal Rule of Evidence 403.

Frokjer raised an objection to the composite videotape, which was eventually labeled as Government Exhibit 6B, by way of a motion in limine prior to trial. The district court declined to rule on admissibility of the composite videotape before opening statements, and advised counsel that the court would defer its ruling until it had an opportunity to watch the videotape. (Tr. I at 11). During the testimony of the first witness, the government played the videotape without any audio track. (Tr. I at 169-70, 175).[2]

---

[2]When the exhibit was offered on the first day of trial, the government identified it as Government Exhibit 6A. Later, on the fourth day of trial, the government advised the court that the exhibit played for the jury on the first day was really Government Exhibit 6B. (Tr. IV at 15).

-6-

At the end of the first day of testimony, the district court inquired about the videotape, asking whether the government intended to "play it again with sound." The government replied that it wished to do so at some point in the proceedings. The district court inquired whether the government had the ability to play just the audio portions, and when the government advised that it could do so, the court remarked: "Well, we'll discuss that tomorrow, but my first thought it that it's pretty cumulative to have them watch the whole 28-minute video again, so maybe we'll just do the audio. So long as you have it in that format, I think that may both cure the objection and take care of the problem of playing the whole tape again." (Tr. I at 219).

The parties did not revisit the admissibility of the composite videotape on the following day, and the matter did not arise again until the fourth day of trial. In the meantime, the court received into evidence, without objection, the complete underlying videotapes and audiotapes from which the composite videotape was created. (Tr. II at 166-67, IV at 16; Gov. Ex. 7A-7Z; Gov. Ex. 8A-8F).

On the fourth day of trial, during the testimony of a postal inspector, the government offered into evidence two videotapes – Government Exhibit 6B, discussed above, and Government Exhibit 6A, which included surveillance video of Frokjer's activities between October 19, 2001, and June 19, 2002. The witness testified that both exhibits were composite videotapes from surveillance activity, which had been "slightly revised" to "take off any sound that had been added to them." (Tr. IV at 14). The court received both exhibits without objection. (Tr. IV at 15).

Shortly thereafter, the government played a portion of Government Exhibit 6B to depict Frokjer's activities on July 11, 2002. After playing the tape, the prosecutor apologized to the court and said "[t]hat's the wrong one, obviously." The court inquired, "Is that the same tape that's been received in evidence now?," and the government responded, "I believe it has, your Honor." The court then ruled that "[i]f

it's part of Government's Exhibit 8 audios, then it can be played. It's in anyway." (Tr. IV at 26-27). This was a reference to the fact that the audio track of the composite videotape consisted of excerpts from a series of audiotapes which had been admitted as Government Exhibits 8A-8F. There was no objection by Frokjer during this colloquy, and the composite tape was played for the jury. Frokjer's counsel then cross-examined the postal inspector, pointing out that while the videotape showed Frokjer shopping on July 11, the corresponding audio portion was recorded almost a month later on August 7. (Tr. IV at 35-36).

The government argues that Frokjer "waived" any objection to the composite videotape by failing to object to its admission into evidence on the fourth day of trial and then cross-examining the postal inspector regarding the discrepancy between the dates of the video and audio portions of the tape. This contention has some support in our cases. Where the district court does not enter a "definitive ruling" on a motion *in limine* to exclude certain evidence, *see* Fed. R. Evid. 103(a), and the movant then makes a tactical decision to refrain from objecting when the evidence is offered at trial, and instead to attack the evidence on cross-examination or use the evidence to her advantage, the evidentiary objection is not merely forfeited, but waived. *See United States v. Dunnaway*, 88 F.3d 617, 618 (8th Cir. 1996); *United States v. Mihm*, 13 F.3d 1200, 1204 (8th Cir. 1994). "If a party's failure to take an evidentiary exception is simply a matter of oversight, then such oversight qualifies as a correctable 'forfeiture' for the purposes of plain error analysis. If, however, the party consciously refrains from objecting as a tactical matter, then that action constitutes a true 'waiver,' which will negate even plain error review." *United States v. Yu-Leung*, 51 F.3d 1116, 1122 (2d Cir. 1995).

Whether Frojker consciously refrained from objecting to the composite videotape as a tactical matter necessarily involves some evaluation of counsel's likely state of mind at the time the objection should have been advanced. Based on the record in this case, we do not find sufficient indicia of waiver. Before the videotape

was played, the record suggested that the audio track had been removed from the composite videotape. After the tape was played, the government stated that it was "the wrong one, obviously." The court then permitted the playing of the composite videotape with audio overlay, noting that the complete audiotapes from which the composite was excerpted already had been admitted. Of course, Frokjer could have raised an objection at that time to playing a videotape with audio overlay, but given the confusion in the record, and the quick action required, we decline to conclude that Frokjer consciously refrained from objecting for tactical reasons. We think it just as likely that the failure to object was due to oversight, and that the cross-examination was an effort to make the best of the situation after the videotape had been played.

Nonetheless, because the district court never made a definitive ruling on Frokjer's motion *in limine* to exclude the composite videotape, her failure to object to the videotape when it was played during trial amounts to a forfeiture of any error, and we review her appeal under the plain error standard. Therefore, she must show "(1) 'error,' (2) that is 'plain,' and (3) 'that affect[ed her] substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 467 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732). An error affects substantial rights if there is "'a reasonable probability that, but for [the error claimed], the result of the proceeding would have been different.'" *United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2339 (2004) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)) (alteration in original). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) 'the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson*, 520 U.S. at 467 (quoting *Olano*, 507 U.S. at 732) (internal quotations omitted).

Although we are inclined to believe the district court's initial instinct – to play the audiotapes separately from the videotape – may have been the better course, given the discrepancy in dates between audio and video and the relatively brief savings of time achieved by combining them, we do not believe the court's decision to admit the

composite videotape amounted to an obvious abuse of discretion that might warrant relief under the plain error standard. The term "unfair prejudice" in Rule 403, as applied to a criminal defendant, "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). Frokjer contends that the composite tape, by aligning her recorded statements professing inability to work on certain dates with video of her engaging in physical activity on different dates, may have "lured" this jury into believing erroneously that she made false statements.

We do not believe the potential for unfair prejudice was so pronounced as to make the district court's admission of the evidence an obvious abuse of discretion. The dates of both the audio and video recordings were clearly displayed on the videotape, and we see virtually no chance that a jury mistakenly would believe that the audio recordings were made contemporaneously with the video recordings. The defense further ensured that the jurors would not make this mistake by emphasizing on cross-examination that the video scenes and audio overlay were recorded at different times. Frokjer's argument thus reduces to the potential that although the jury was clearly advised through information on the videotape and through witness testimony that the audio and video were not contemporaneous, the jury might subconsciously have been influenced to convict on an improper basis by the prosecution's juxtaposition of the images and sound. We think this risk is too remote to conclude that the district court committed an obvious error or that Frokjer's substantial rights were affected.

IV.

Frokjer argues that she was deprived of her right to a fair trial when the prosecuting attorney thrice during closing arguments offered his personal opinion as to the truth of Frokjer's testimony. She first points to the prosecutor's statement

discussing Frokjer's dissatisfaction with an ergonomic chair that the Post Office purchased for her to use:

> Members of the jury, the judge will tell you use your common sense. You're allowed to do that. Look at the chair. You can count the number of levers that are obvious to everyone. That chair was fully adjustable to fit the smallest person to the tallest person, the thinnest person to the widest person. The arms went up and down, the head went up and down, the back could be adjusted, the sheet [sic] could be adjusted. It's a farce for Ms. Frokjer to take the stand and say she didn't know that that could be adjusted. It's ridiculous for her to say to you that she had to wait until August until she could pick out her chair of choice before she could do that job that had been made available to her.

The prosecutor later said, when discussing the testimony of Frokjer's shop steward regarding Frokjer's claim that she was injured when the towline was installed:

> Remember Jim Miller testified? He was from APWU, the American Postal Workers Union. . . . And part of the shop steward's job, as you heard from Mr. Miller, is to be aware of any grievances or safety issues, and Mr. Miller took the stand and under oath told you that Arlene came to him sometime while that towline was being repaired and said: "I'm hurt." That's not believable. If she had done that, there would be a report of it. You can bet. You can bet that if a worker had come and complained about an ongoing condition at the workplace, it would have been elevated up. Management would have heard it, the union would have done something about it, and Mr. Miller candidly admitted he didn't write anything down about it.

Finally, the prosecutor summarized the case by saying:

> Again, as you consider all of the evidence in this case, we ask that you not only consider the evidence that's written in words on paper and the

testimony that's provided by the witnesses, but you can use your common sense in looking at this. Is the person who represented herself to her doctors as being unable to perform even the simplest tasks for a couple hours a day the same person who did all those other tasks on the tape? She was lying, she was cheating, and she stole money. We ask you to convict her on all 15 counts.

Frokjer argues that taken together, these comments let the prosecutor act as a "thirteenth juror," and interfered with Frokjer's right to a fair trial.

Because the defense did not object to any of these statements during trial, the alleged errors were not preserved for appellate review, and we may reverse the convictions only if the alleged misconduct rises to the level of plain error. *United States v. Kehoe*, 310 F.3d 579, 594 (8th Cir. 2002); *see also United States v. Robinson*, 110 F.3d 1320, 1326 (8th Cir. 1997) ("If an arguably improper statement made during closing argument is not objected to by defense counsel, this court will only reverse under exceptional circumstances.") (internal quotations omitted). We ordinarily apply a two-part test to determine whether prosecutorial misconduct has occurred: "first, the prosecutor's conduct or remarks must have been improper, and second, the remarks or conduct must have prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial." *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001).

We do not believe it was improper for the prosecutor to assert that it was a "farce" for Frokjer to claim that she did not know the ergonomic chair was adjustable. "Prosecutors are entitled to argue reasonable inferences to be drawn from the facts in evidence during closing arguments," *United States v. Schumacher*, 238 F.3d 978, 981 (8th Cir. 2001), including an inference that the defendant is not credible. "It is permissible for a prosecutor to interpret the evidence as indicating that the defendant is not telling the truth," *White*, 241 F.3d at 1023, and "[s]o long as prosecutors do not stray from the evidence and the reasonable inferences that may be drawn from it, they,

no less than defense counsel, are free to use colorful and forceful language in their arguments to the jury." *Robinson*, 110 F.3d at 1327. The prosecutor here argued in favor of an inference that the adjustability of the chair was plainly obvious on a cursory inspection of the chair, and thus that Frokjer's claim that she did not know the chair was adjustable was incredible. We believe the prosecutor was not asserting his personal belief as to the veracity of Frokjer's testimony, but was rather "stat[ing] his . . . contention as to the conclusion the jury should draw from the evidence" in light of their common sense. *United States v. Segal*, 649 F.2d 599, 604 (8th Cir. 1981). This was entirely permissible.

Frokjer's second complaint, regarding the prosecutor's assertion that *witness Miller* was lying, was not directed at the veracity of *Frokjer's* testimony, as Frokjer suggests. In any event, we conclude that the prosecutor again simply "argu[ed] reasonable inferences to be drawn from the facts in evidence," *Schumacher*, 238 F.3d at 981, and did not engage in any improper conduct by urging the jury to reject Miller's testimony.

In the third disputed comment, the prosecutor summarized the government's case against Frokjer for wire fraud and making false statements to obtain government benefits. In colloquial terms, Frokjer was charged with lying to obtain benefits, and there is nothing wrong with the prosecutor arguing that the evidence proved that she was lying. The comments thus constitute "a permissible argument describing the sufficiency of the evidence." *United States v. Papajohn*, 212 F.3d 1112, 1120 (8th Cir. 2000), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

Taken individually or as a whole, we find that the cited comments do not support a finding of improper prosecutorial argument. We thus discern no plain error in the district court's oversight of the final arguments.

V.

With respect to her sentence, Frokjer argues that the district court abused its discretion by failing to recognize that it had authority to depart downward from the otherwise applicable sentencing guideline range when imposing sentence. Prior to *United States v. Booker*, 125 S. Ct. 738 (2005), we held in the context of the former mandatory guideline system that "[a] district court's refusal to grant a downward departure is generally unreviewable on appeal, unless the district court had an unconstitutional motive or erroneously believed that it was without authority to grant the departure." *United States v. Gonzalez-Lopez*, 335 F.3d 793, 799 (8th Cir. 2003). This holding was grounded in our interpretation of 18 U.S.C. §§ 3742(a) and (b), which provide that a defendant may appeal an upward departure and the government may appeal a downward departure. *United States v. Riza*, 267 F.3d 757, 758-59 (8th Cir. 2001); *see also Koon v. United States*, 518 U.S. 81, 96 (1996).

After *Booker*, the district courts continue to determine whether a defendant should be granted a traditional downward departure under the rubric of the now-advisory guideline scheme, *see United States v. Haack*, 403 F.3d 997, 1003 (8th Cir. 2005), and we see no reason why *Booker* – which left intact §§ 3742(a) and (b) – should alter our rule that a district court's discretionary decision not to depart downward is unreviewable. The district court in this case clearly recognized that it had the authority to depart and declined to exercise that authority because it did not believe Frokjer was a "good fit" for any of the available grounds for downward departure. We thus decline to review Frokjer's claim that she was entitled to a departure under the guidelines.[3]

---

[3]After *Booker*, however, we will review a defendant's argument that even a sentence within the advisory guideline range is "unreasonable" with regard to the factors set forth in 18 U.S.C. § 3553(a), *see United States v. McCully*, 407 F.3d 931, 933-34 (8th Cir. 2005), and an unreasonable sentence would be imposed "in violation of law" within the meaning of § 3742(a).

After the case was briefed, Frokjer filed a motion for leave to file a supplemental brief in light of developments in the law after *Blakely v. Washington*, 124 S. Ct. 2531 (2004). Since then, the Supreme Court has decided *Booker*, and we consider Frokjer's claim in that light. Frokjer suggests that because the district court, rather than the jury, determined the amount of loss according to which Frokjer was sentenced under the guidelines, the application of mandatory guidelines in her case was unconstitutional. She did not raise this issue at sentencing, so we review the contention under the plain error standard. *See United States v. Pirani*, 406 F.3d 543, 550 (8th Cir. 2005).

Upon review of the record, we conclude that Frokjer's sentence involves no constitutional error. The district court arrived at a total offense level of fourteen under the guidelines, including an eight-level increase based on the amount of loss. But Frokjer explicitly stipulated to the loss amount prior to sentencing, (S. Tr. 6-7), and an imposition of a mandatory guideline sentence based on facts admitted by the defendant does not run afoul of the Sixth Amendment. *Booker*, 125 S.Ct. at 756.

Because Frokjer was sentenced under the mandatory guidelines, however, her sentence involved non-constitutional error under the remedial holding of *Booker* that the guidelines are now effectively advisory. To obtain relief under the plain-error test, Frokjer must show a reasonable probability that she "would have received a more favorable sentence under an advisory guidelines regime." *Pirani*, 406 F.3d at 546. Frokjer's sentence was at the bottom of the applicable guideline range, but that "is insufficient, without more, to demonstrate a reasonable probability that the court would have imposed a lesser sentence absent the *Booker* error." *Id.* at 553. The record includes no other evidence establishing a reasonable probability that the district court would have imposed a more favorable sentence under the advisory guideline system. Where the effect of the error on the result in the district court is uncertain and we would have to speculate, there is not a "reasonable probability that

-15-

the result would have been different but for the error." *Id.* (quoting *United States v. Rodriguez*, 398 F.3d 1291, 1301 (11th Cir. 2005)).

We also conclude that Frokjer's sentence, which was consistent with the now-advisory guidelines, is not unreasonable with regard to 18 U.S.C. § 3553(a). Frokjer argued that the district court should have departed downward from the then-mandatory guidelines based on her medical condition (which counsel said included a recent diagnosis of Type II diabetes and the "possibility" of back surgery), her age (45 years), the poor health of her father and her responsibilities in caring for him, the non-violent nature of the offense, and the absence of any prior criminal history. The court viewed these considerations as insufficient to warrant a downward departure from the guidelines, noting among other things that there were "a number of adults and other people around" who could care for Frokjer's father in her absence. (S. Tr. at 19). Of course, a sentencing court has more flexibility under *Booker* and § 3553(a) than it had under the mandatory guidelines, and we need not foreclose the possibility that evidence of this sort might, in an appropriate case, justify varying from the advisory guidelines. Even where a variance is permissible, however, it is not necessarily required, and we believe that a sentence consistent with the advisory guidelines for Ms. Frokjer is well within the range of reasonableness.

\*          \*          \*

For the foregoing reasons, the judgment of the district court is affirmed. Frokjer's motion for leave to file a supplemental brief is denied.

———————————————