

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-28-2006

# USA v. Tupone

Precedential or Non-Precedential: Precedential

Docket No. 04-2832

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"USA v. Tupone" (2006). *2006 Decisions.* Paper 1334.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1334

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Case No: 04-2832

UNITED STATES OF AMERICA

v.

ALBERT TUPONE,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 03-CR-00169
District Judge: The Honorable Jan E. DuBois

Argued December 12, 2005

Before: SLOVITER, SMITH, and STAPLETON, *Circuit
Judges*

(Filed: March 28, 2006)

Counsel:     Ellen C. Brotman (Argued)
Carroll & Brotman
601 Walnut Street
Suite 1150 West
Philadelphia, PA 19106

Norris E. Gelman
Suite 940
6th & Chestnut Streets
Public Ledger Building
Philadelphia, PA 19106
*Counsel for Appellant*

Sarah L. Grieb (Argued)
Suite 1250
Office of United States Attorney
615 Chestnut Street
Philadelphia, PA 19106
*Counsel for Appellee*

---

OPINION OF THE COURT

---

SMITH, *Circuit Judge*

Albert Tupone appeals his felony conviction for making false representations in connection with the receipt of federal

workers' compensation benefits, a violation of 18 U.S.C. § 1920. Although Tupone and the Government agree that this case should be remanded for resentencing under the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), a conclusion with which we agree, we must decide two remaining issues. The first is whether the District Court erred in instructing the jury on the threshold dollar amount for a felony conviction under § 1920, and in holding that the jury's verdict constituted felony, rather than misdemeanor convictions. The second is whether the District Court erred in finding that the total amount of benefits Tupone received as a result of false applications for workers' compensation benefits constituted the "loss amount" under § 2B1.1 of the United States Sentencing Guidelines (the "Guidelines"). Because we conclude that the District Court's interpretation of § 1920 was sound, we will affirm Tupone's conviction. Because we also conclude, however, that the "loss amount" fixed by the Court was incorrect under the Guidelines, we will vacate the sentence, and we will remand the case for resentencing in light of *Booker* and based on a properly calculated loss amount.

I.

On June 20, 1974, Albert Tupone was an employee of the United States Postal Service. On that day, Tupone suffered disabling injuries to his back and eardrum when his mail truck was involved in an accident. As a result of his injuries, Tupone was found to be totally disabled and began to receive disability

3

payments from the United States Office of Workers' Compensation Program ("OWCP").

Each year that Tupone received disability payments, the Department of Labor monitored his status by, *inter alia*, sending him a questionnaire to complete – Form 1032. In particular, Tupone was required to answer truthfully the following questions: (1) "Did you work for any employer during the period covered by the form?"; and (2) "Were you self-employed or involved in any business enterprise during the period covered by the form?" During the years 1998 through 2000, Tupone received Form 1032, and each year he answered the above employment questions "No." As a result of his answers, Tupone received tax-free benefits in the amount of $17,894 for 1998, $16,592 in 1999, $19,946 in 2000, for a total of $54,432.

In late 1997, however, Tupone began to buy, repair, and resell used cars. Over the three years in question, Tupone bought and sold approximately twenty-five cars for some disputed amount of profit.[1] Tupone neither reported the income

---

[1]The Government asserts that Tupone's profits totaled $8982.68; Tupone says they were only $3300.81. For the sentencing hearing, Tupone produced an extensive exhibit, "Exhibit A," based in large part on Tupone's testimony at trial, detailing the profits made from each car sale. Both profit figures are based on that exhibit. Tupone's figure is lower because the Government's calculation, tracking that of an

4

to the Department of Labor nor advised the Department of his self-employment activity when filling out the 1032 forms for 1998 through 2000. The Department of Labor discovered the omissions, and a criminal investigation ensued.

On March 13, 2003, a grand jury returned an indictment against Tupone charging him with three counts of violating 18 U.S.C. § 1920.[2] The indictment alleged that Tupone had

---

OWCP employee called to testify at sentencing, "did not use any items that showed a net loss." In any event, the parties stipulated, for sentencing purposes, on the amount that Tupone's benefits would have been reduced had he reported his car sale income. *See infra*, this section.

[2]Section 1920 states:

> Whoever knowingly and willfully falsifies, conceals, or covers up a material fact, or makes a false, fictitious, or fraudulent statement or representation, or makes or uses a false statement or report knowing the same to contain any false, fictitious, or fraudulent statement or entry in connection with the application for or receipt of compensation or other benefit or payment under subchapter I or III of chapter 81 of title 5, shall be guilty of perjury, and on conviction thereof shall be punished by a fine under this title, or by imprisonment for not more than 5 years, or both; but if the amount of the benefits falsely obtained

violated the statute by certifying "on three 1032 forms that he had . . . no self-employment and no earned income from any employment for the previous fifteen month period." Count One was based on the form filed on July 1, 1998, which covered the "previous 12 months"; Count Two was based on the form filed on May 4, 1999, which covered the "previous 11 months"; and Count Three was based on the form filed on May 30, 2000, which covered the "previous 13 months." Paragraph 6 of the indictment indicated that Form 1032 "was used to determine whether the claimant qualified for continued benefits and to determine whether an adjustment for continued benefits was warranted." Paragraph 15 of the indictment alleged that Tupone "knowingly and willfully . . . concealed . . . material facts, and made false . . . representations, in connection with the receipt of compensation and other benefits and payments exceeding $1000, under Subchapters I and III of Chapter 81 of Title 5 of the United States Code, the federal workers' compensation law."

At trial, the OWCP employee assigned to Tupone's case testified as to the total amount of benefits Tupone had received during the period covered by the indictment. A second OWCP employee, Agent Gallagher, testified that had Tupone been

---

does not exceed $1,000, such person shall be punished by a fine under this title, or by imprisonment for not more than 1 year, or both.

18 U.S.C. § 1920.

6

truthful on his 1032 forms, the Department of Labor would have reduced his benefits according to profits made, required additional medical examinations, and initiated the process designed to determine if Tupone was still disabled and whether his benefits should be further reduced or terminated.

At the close of evidence, the Court instructed the jury on the elements of the offense:

> Counts 1, 2, and 3 of the indictment charge defendant with violating Federal law requiring recipients of Federal disability benefits to report any employment or self-employment and any income earned through that employment.

> 18 United States Code Section 1920 provides in part that whoever knowingly and willfully falsifies, conceals or covers up a material fact or makes a false, fictitious or fraudulent statement or representation or makes or uses a false statement or report, knowing the same to contain any false, fictitious or fraudulent statement or entry in connection with the application for or receipt of compensation or other benefit or payment in excess of $1,000, under Subchapter 1 or 3 of Chapter 81 of Title 5, shall be guilty of an offense against the United States. That's the statute.

> The defendant can be found guilty of the

offense of making false statements in order to receive Federal disability benefits only if all of the following facts are proved beyond a reasonable doubt. These are what we refer to as the essential elements of the crime charged.

First, that defendant knowingly and willfully made a false statement or report to the Department of Labor, Office of Workers' Compensation Program as charged in Counts 1, 2 and 3 of the indictment.

Second, that the false statement or report was made in connection with an application for or receipt of Federal workers [sic] compensation benefits in excess of $1,000.

And, third, that the false statement or report related to a material fact.

The jury found Tupone guilty of each count of making false statements.

At the sentencing hearing, Tupone argued that § 1920 defined both a felony and a misdemeanor, and that the felony required proof that Tupone had received more than $1,000 in "falsely obtained benefits," an element of the crime which the jury had not been instructed to find. The Court rejected the argument that "falsely obtained" meant something different than receiving a benefit "in connection with" a false statement. The

District Court entered felony convictions based on the jury verdict.

On the issue of the "loss" calculation under the Guidelines, Agent Gallagher of the OWCP testified regarding his calculation of the immediate reduction in Tupone's benefits that would have resulted had he reported his earnings on his 1032 forms: $1,955.25 in 1998; $3,718 in 1999; and $1,647.25 in 2000, for a total reduction of $7,320.50. Gallagher also indicated, as he had at trial, that reported income or employment by Tupone would have triggered a re-evaluation process regarding Tupone's status that could have led to a further reduction or even elimination of his benefits and may have resulted in Tupone's return to some form of work.

Based in large part on Agent Gallagher's testimony, the District Court found that the "loss" for Guidelines purposes associated with Tupone's offenses was not merely the $7,320.50 in foregone earnings-based benefit reductions, but the entire amount of benefits that Tupone had received during the indictment period – $54,432. Using that finding, the Court determined that Tupone's total offense level was 12 (rather than 6), and, applying the pre-*Booker* mandatory Guidelines regime, sentenced Tupone to five months incarceration and three years supervised release, including five months of home detention. Tupone appealed.

II.

The District Court exercised subject matter jurisdiction over this criminal case under 18 U.S.C. § 3231. We exercise appellate jurisdiction over the District Court's final order pursuant to 28 U.S.C. § 1291.

Because Tupone's challenge to the jury instructions turns on a matter of statutory interpretation, our review is plenary as to that issue. *United States v. Cooper*, 396 F.3d 308, 310 (3d Cir. 2005). We review the District Court's application of the Guidelines to facts for abuse of discretion. *Buford v. United States*, 532 U.S. 59, 63-66 (2001). Factual findings will be reversed only if clearly erroneous. *United States v. Moorer*, 383 F.3d 164, 167 (3d Cir. 2004); *United States v. Napier*, 273 F.3d 276, 278 (3d Cir. 2001).

III.

Whether the District Court adequately instructed the jury turns on a specific question of statutory interpretation. The parties agree that "[w]here the language of the statute is clear . . . the text of the statute is the end of the matter." *Steele v. Blackman*, 236 F.3d 130, 133 (3d Cir. 2001). The key issue in this case is the meaning of the phrase "benefits falsely obtained." Both parties look to the "plain text" of the statute, and both believe that the text cuts their way. We conclude that the Government's reading of the statute best comports with the

10

text and structure of § 1920.

Tupone argues before us, as he did at sentencing, that the phrase "falsely obtained" requires that an additional element be proved in order for a § 1920 violation to constitute a felony. He asserts that the use of "falsely obtained" means that, for a jury verdict to constitute a felony conviction under § 1920, a jury must find a $1000 *difference* between what a given defendant was *entitled* to receive had he been truthful and what he *actually received* owing to his false statement. Because the indictment and jury instructions did not include the phrase "falsely obtained," Tupone argues that he was charged with, and the jury convicted him of, a misdemeanor.[3]

The District Court rejected that argument and stated:

> [A]nother way to read the statute is that it makes it a crime to falsely apply for or receive compensation or other benefits. And if the

---

[3]Thus, Tupone asserts, his sentence was improper under the Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), which requires that any fact that would raise a defendant's sentence beyond the prescribed statutory maximum must be charged in the indictment and proved beyond a reasonable doubt to a jury. *Id.* at 490. Tupone argues that the additional element required to increase his sentence from the misdemeanor range to the felony range was not found by the jury.

11

benefits falsely obtained, *which is all of the benefits* does not exceed $1,000, we have a misdemeanor and not a felony.

. . . .

I think the statute criminalizes making of [sic] a false statement in connection with the application for or receipt of compensation, and it makes it a misdemeanor only if the amount of benefits at issue – I think they could have said "at issue," but they said "falsely obtained," in the statute, does not exceed $1,000. That's a misdemeanor.

According to Tupone, the District Court's reading of § 1920 renders the phrase "falsely obtained" meaningless. In other words, he submits that the District Court ignored the "distinction Congress drew between the misdemeanor offense of filing a false application . . . which is complete at the time of filing and requires no loss, and the felony which only occurs when and if the applicant is paid $1,001 more than he is entitled to receive."

The Government argues that the structure and design of § 1920 show that the statute "clearly sets forth the prohibited conduct up front, and makes the violation of the statute a felony." In other words, "benefits falsely obtained" refers back to the criminal conduct proscribed by the statute, i.e., obtaining

12

any benefits as a result of false statements. Under this reading, "benefits falsely obtained" is not rendered meaningless; it is synonymous with and refers to benefits received "in connection with" a false statement.

Although our cases offer no precedent dealing directly with the meaning of § 1920, two other circuits have weighed in on the proper reading of the statute. The Tenth Circuit, in *United States v. Henry*, 164 F.3d 1304, 1310 (10th Cir. 1999), concluded that the "plain terms" of § 1920 pertain, at least for loss calculation purposes, to the benefits obtained in connection with a false application, "not the amount of benefits obtained minus the amount that would have been obtained if no false statement had been made." *Id.* In *United States v. Hurn*, 368 F.3d 1359, 1362 (11th Cir. 2004), the Eleventh Circuit Court of Appeals indicated that § 1920 requires a jury to find "a causal link" between a defendant's false statement and his receipt of $1,000 in benefits.[4] *Id.* The Court in *Hurn* also stated, however, that "[a] reasonable juror would be likely to conclude that a benefit is obtained 'falsely' if it is obtained as a result of a fraudulent or misleading statement or omission." *Id.* In other words, the Eleventh Circuit concluded that "benefits falsely

---

[4]We note that the *Hurn* case is not precisely analogous to the instant appeal inasmuch as the jury instruction in *Hurn* did include the phrase "falsely obtained." Nonetheless, the Court's comments regarding the proper interpretation of § 1920 are instructive.

13

obtained" is synonymous with benefits received as a result of a false application. No court has addressed § 1920 and interpreted the statute in the manner urged by Tupone.

In matters of statutory interpretation, the "plain meaning" of statutory language is often illuminated by considering not only "the particular statutory language" at issue, but also the structure of the section in which the key language is found, "the design of the statute as a whole and its object . . . ." *United States v. Schneider*, 14 F.3d 876, 879 (3d Cir. 1994). The Supreme Court has stated consistently that the text of a statute must be considered in the larger context or structure of the statute in which it is found. *See*, *e.g.*, *City of Rancho Palos Verdes v. Abrams*, 125 S. Ct. 1453, 1462 (2005) ("context, not just literal text, will often lead a court to Congress' intent in respect to a particular statute"); *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001) ("interpretive inquiry begins with the text and structure of the statute").

Many of our own cases reflect this methodology as well. *See*, *e.g.*, *Zheng v. Gonzalez*, 422 F.3d 98, 116 (3d Cir. 2005) (expressly looking to the text and structure of a statute to discern Congressional intent); *Booth v. Churner*, 206 F.3d 289, 295 (3d Cir. 2000) ("We do not quarrel with petitioner's claim that the most natural reading of [the relevant phrase], when viewed in isolation, would [suggest one result]. However, statutory language must always be read in its proper context. . . . [W]hen the relevant section is read in its entirety, it suggests [the

14

opposite result]") (internal citations omitted). It would therefore be a mistake to "squint[] myopically" at the phrase "falsely obtained" and interpret it in isolation, rather than in the context of the "text and structure" of § 1920 as a whole. *M.A. ex rel. E.S. v. State-Operated Sch. Dist. of the City of Newark*, 344 F.3d 335, 348 (3d Cir. 2003).

We conclude that, when read in its entirety, § 1920's phrase "benefits falsely obtained" refers back to – and is synonymous with – any benefits received "in connection with" the making of a false representation. The overall "design" and "object" of § 1920 is to criminalize the making of false statements in the application for and receipt of government benefits. *Schneider*, 14 F.3d at 879. The language of the primary clause – the import of the section as a whole – is concerned with communicating that *any* knowing or willful false statement made in connection with the application of or receipt of benefits will be considered a felony. The misdemeanor exception for benefits less than $1000 rated no separate section, no subsection, nor even a separate paragraph. Nowhere does § 1920 offer a separate definition for "benefits falsely obtained." The statute is devoid of any language that would require the calculation (i.e., amount of benefits received minus amount rightly owed in the absence of the false statement) that Tupone argues is required by its "plain text" for felony conviction. All of the above militates in favor of the District Court's reading of the statute.

15

In contrast, Tupone's reading turns the import of § 1920 on its head even as he claims to be taking its overall structure into consideration. Tupone argues that deference is required to the "distinction Congress drew between the misdemeanor offense of filing a false application . . . which is complete at the time of filing and requires no loss, and the felony which only occurs when and if the applicant is paid $1,001 more than he is entitled to receive." Such a reading suggests that the main thrust of the entire statute is to create a *misdemeanor*, with the latter clause carving out a narrow category of felony liability. An examination of the Federal Criminal Code reveals such a structure to be highly atypical among criminal statutes – especially those dealing with fraud, theft, or false statements – that provide for both felony and misdemeanor offenses. In fact, numerous sections of the criminal code mirror the precise linguistic pattern found in § 1920. *See*, *e.g.*, 18 U.S.C. §§ 655, 656, 1003, 1025. The above code sections and those like them all include the same structural elements: a lengthy primary clause describing certain illegal conduct and providing for felony punishment thereof; a semicolon; and, finally, a second clause – beginning with the word "but" – which refers back to the illegal conduct described in the main clause and provides for misdemeanor punishment in cases where the dollar value *associated with the aforementioned illegal conduct* does not exceed $1000. *See*, *e.g.*, *id.* In other words, the above statutes are felony criminal statutes that include a narrow misdemeanor exception in the event that the illegal conduct results in *de minimus* gain.

16

We reject the argument that, unlike all other identically structured provisions in the Federal Criminal Code, § 1920 alone primarily establishes a misdemeanor and creates a narrow "felony exception" that turns on an undefined, two-word phrase, and that requires a calculation nowhere mentioned or implied in the text. The much more natural and obvious reading of § 1920 is that the main "effect" of the text is to create the *felony* of making false statements related to government benefits, and to carve out a narrow misdemeanor exception for those defendants whose false statements relate to applications for or receipt of *de minimus* benefits and dollar amounts.[5]

Applying this interpretation of the statute, we conclude that both the indictment and jury instructions set out the necessary elements for felony liability under § 1920. Paragraph 15 of the indictment alleged that Tupone "knowingly and

---

[5]Accordingly, we note that Tupone's "rule of lenity" argument is unavailing. Under Supreme Court and Third Circuit precedent, the rule of lenity "applies only where a statute is found to be ambiguous upon review of the text, structure, legislative history and policies of the statute, not at the beginning of the process of construction, as an overriding consideration of being lenient to wrongdoers." *E.g.*, *United States v. Johnson*, 155 F.3d 682, 685 (3d Cir. 1998) (internal quotations and citations omitted). As discussed above, any ambiguity that may exist as to the text of the latter clause of § 1920 is resolved upon review of the structure of the section as a whole.

willfully . . . concealed . . . material facts, and made false . . . representations, in connection with the receipt of compensation and other benefits and payments exceeding $1000 . . . ." The jury instruction stated, *inter alia*, that the jury must find that Tupone "knowingly and willfully made a false statement or report to the Department of Labor . . . in connection with an application for or receipt of Federal workers [sic] compensation benefits in excess of $1,000." Although neither the indictment nor the instruction contained the phrase "falsely obtained," both tracked other language from § 1920 that expresses all the elements necessary for a felony violation of the statute.

The phrase "benefits falsely obtained" does not create an additional element to felony liability under § 1920. The District Court therefore properly treated the jury verdict against Tupone as three felony convictions. The conviction will be affirmed.[6]

IV.

We must next decide whether the District Court erred in finding that the loss resulting from Tupone's false statements equaled the entire amount of benefits Tupone received from 1998 to 2000 ($54,432), rather than fixing the loss at the amount

---

[6]Because we conclude that the District Court committed no error as to the jury instructions, we need not reach the issue – briefed by the parties – whether the standard for evaluating such an error would be "plain error" or "harmless error."

18

that Tupone's benefits would have been reduced immediately had Tupone filed truthful 1032 forms ($7,320.50). We conclude that the Court erred in its application of the Guidelines to this case.

## A.

Tupone argues that the correct measure of "loss" under the Guidelines as applied to § 1920 is "the difference between what Tupone actually received, and what he would have received, if his forms had been accurate." The Government implicitly argues that the loss under § 1920 is necessarily equal to the entire amount of benefits received as a result of Tupone's false statements. We are persuaded that, in general, the Guidelines support a "difference" method of loss calculation.

The Commentary to U.S.S.G. § 2B1.1 states that, as a general rule, "loss" under § 2B1.1 is the greater of "actual" or "intended" loss. U.S.S.G. § 2B1.1 app. note 3(A). That same Commentary, however, indicates clearly that cases involving government benefits call for the use of a more particularized standard in evaluating loss:

> (F) Special Rules. – Notwithstanding subdivision (A), [which states the above general rule,] the following special rules shall be used to assist in determining loss in the cases indicated

19

. . . .

> (ii) Government Benefits. – In a case involving government benefits (e.g., grants, loans, entitlement program payments), loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.

U.S.S.G. § 2B1.1 app. note 3(F)(ii). This subdivision explains that "loss" in government benefits cases is, at a minimum, equal to the amount of benefits obtained that were not "intended" by the government to be obtained by a given recipient. In those cases in which a defendant was intended by the government to receive some amount of benefits, the loss is the delta between the amount of benefits "intended" by the government to be received by that defendant and any greater amount of benefits actually received.[7]

---

[7]We note that both the parties and the District Court seem to have proceeded under the assumption that U.S.S.G. § 2B1.1 app. note 3(A) provided the relevant definition of "loss" under the Guidelines in this case. As we have indicated, U.S.S.G. § 2B1.1

20

Our cases indirectly support the idea of a "difference" method of calculating loss under the Guidelines in government benefits cases. No precedent binding on this Court has dealt directly with the standard for "loss" under § 1920. [8] That said, there are decisions of our Court which, though they involve specific offenses and Guidelines provisions distinguishable from the case at bar, support the general concept of a "difference" standard of loss. *See United States v. Kopp*, 951 F.2d 521 (3d Cir. 1991) (loss amount in case involving false statements on loan applications is the amount of money the victim lost as of sentencing – i.e., the amount of the loan not repaid – not the full amount of the original loan); *United States v. Evans*, 155 F.3d 245 (3d Cir. 1998) (in case involving fraudulent submission of insurance claims, loss amount does not include legitimate insurance claims submitted on behalf of legitimate victims).

---

app. note 3(F) supersedes subdivision (A) of Note 3 in government benefits cases and provides the relevant definition of "loss" in such cases.

[8]The only two courts of appeal to have addressed the issue squarely came to differing conclusions. As mentioned above, in *Henry,* the Tenth Circuit stated explicitly that "the plain terms of § 1920 pertain to 'the amount of the benefits obtained,' not the amount of benefits obtained minus the amount that would have been obtained if no false statement had been made." *Henry*, 164 F.3d at 1310. The Fourth Circuit, however, in *United States v. Dawkins*, 202 F.3d 711, 715 (4th Cir. 2004), held that the "difference" standard was correct.

Furthermore, as an analytical matter, we note the necessary distinction between the task of evaluating the text of § 1920 proper and that of measuring the "loss" amount under the Guidelines resulting from a violation of that text. The former task involves assessing the breadth and level of culpability – and liability – prescribed by the language of § 1920. As discussed above, Congress, in passing § 1920, ascribed felony liability to the making of false statements in connection with the application for or receipt of benefits in excess of $1000. For the qualitative purpose of measuring criminal liability, then, *all* the benefits which a defendant applies for or receives must necessarily be "counted."

Loss calculations under the Guidelines, however, generally involve a different analytical goal. Rather than measuring the more qualitative categories of criminal culpability and liability as such, the court attempts to reach an appropriate sentence by quantifying the amount of "harm" wrought against the victim – here the government – by a particular criminal act. Applying that principle to § 1920 and other government benefits cases, the Guidelines Commentary defines the aforementioned "harm" as the value of benefits obtained by an individual in the absence of a government intention that he obtain them. Accordingly, we hold that the proper "loss" calculation under the Guidelines for a violation of 18 U.S.C. § 1920 is the difference between the amount of benefits actually obtained by a given defendant and the amount the government intended him to receive during the relevant period.

B.

Applying the above standard, we conclude that the District Court erred in finding that the "difference" in this case was the entire amount of benefits Tupone received from 1998 through 2000.

In this case, the key guidance on government "loss" is found in OWCP Agent Gallagher's testimony at the sentencing hearing. Based on our review of that testimony, the rest of the sentencing record, and the District Court's remarks regarding the evidence, we conclude that the only "loss" that can be definitively shown on this record is the amount by which Tupone's benefits would have been immediately reduced had he reported his car sale profits.

Gallagher's testimony contained two essential components for loss calculation purposes. The first component involved the immediately ascertainable and retroactive loss that OWCP suffered because Tupone failed to report his income. Gallagher testified that Tupone's activities during the relevant years did not constitute "sufficient information to establish a pattern," and that OWCP "would therefore base any adjustments for these periods of times [sic] strictly on the figures that [Tupone] earned." Gallagher also stated that any overall change in Tupone's disability status resulting from his reported income would affect his prospective benefits and would not be applied retroactively.

23

The second key component of Gallagher's testimony relates to further possible loss based on a re-evaluation of Tupone's eligibility for benefits. Gallagher indicated that had Tupone reported his income on his 1032 form in 1998, the OWCP would have considered that income to be prima facie evidence of "partial disability" rather than total disability and would have initiated a re-evaluation of Tupone that could have led to further reductions in his benefits. Gallagher testified – when questioned by the Court – that his "earnings only" assessment of benefits reduction was a retroactive estimate based on the information provided by the defense as to Tupone's car sale profits. Gallagher said he was hindered in his estimate because, in a trial context, it was given "so late after the fact,"

> [W]hereas, in actual practice, as soon as we're notified of these type [sic] of earnings, we're going to start the ball rolling with the medical examination . . . we're going to determine . . . disability . . . we're going to go back to the employing agency and request a job offer to get [the beneficiary] back to their original employer.

Tupone's attorney responded by asking whether, on the mere basis of "Tupone's sale of six cars in 1999 . . . [OWCP] would start to do a work- [up?]"; Gallagher responded, "Oh yes"; Attorney: "– an earning capacity [?]"; Gallagher: "Yes, absolutely."

Additionally, Agent Gallagher testified that despite the

24

required regular medical reports given by all beneficiaries, a report of earnings or employment by a beneficiary would call into question whatever medical information OWCP had on file. Accordingly, the agency would likely seek an additional and "[m]ore definitive" medical report in light of the new information.

Other evidence illustrates the two-tiered import of Agent Gallagher's testimony. For example, Exhibit B to Tupone's Sentencing Memorandum was a letter sent by Agent Gallagher to the defense after the defense provided Gallagher with profit/loss figures from Tupone's car sales. In that letter, Gallagher states that his best estimate of actual retroactive benefits reductions based on Tupone's profits would have been $7,320.50. Gallagher adds, however, that he "would also point out that had this office been aware of Mr. Tupone's activities, re-evaluation of his medical condition would have been indicated, with potential further reduction or termination of his compensation entitlement."

Taken together, these two aspects of Agent Gallagher's testimony support two distinct propositions. The first is that Tupone's omission of his earnings caused the OWCP to pay Tupone at least $7,320.50 more than OWCP would have "intended" to pay him during the relevant period had he reported his income. U.S.S.G. § 2B1.1 app. note 3(F)(ii). The second is that Tupone's omissions precluded the OWCP from (1) reclassifying Tupone as "partially" rather than totally disabled,

25

and (2) re-evaluating Tupone and, *possibly*, further reducing or terminating his *prospective* eligibility for benefits. Even if Tupone had reported his income on the first relevant 1032 form (in 1998), and that disclosure had led to a re-evaluation by OWCP and a prospective termination of his benefits, Tupone could only have been subject to a partial reduction of his benefits – based on profits earned in the previous year – for the first year of the indictment period. Thus, nothing in the record supports a finding that, had Tupone reported his income on any or all of the relevant 1032 forms, the OWCP would have completely terminated his benefits *retrospectively*, such that he would have been entitled to no benefits at all for the entire indictment period.

Under the Guidelines, the Government has the burden of showing the amount of loss resulting from criminal conduct. The sentencing court, though it need not reach a precise figure as to loss, must make a "reasonable estimate" of loss that must be based on the "available information" in the record. U.S.S.G. § 2B1.1 app. note 3(C). Under the particular facts of this case, the Government failed to show that full retroactive termination of Tupone's benefits – such that the loss resulting from Tupone's omissions would be equal to the entire amount of benefits he received – was among the possible results of any re-evaluation by OWCP. As such, a loss amount set at the entire amount of benefits Tupone received during the indictment period was not within the range of "reasonable estimate[s]" of loss based on the evidence. *Id.*

On this record, a loss calculation set at $54,432, the entire amount of benefits received by Tupone during the indictment period, is precluded by the evidence and constitutes an incorrect application of the Guidelines. We conclude that the "available information" in this case shows with adequate certainty that Tupone's false representations caused him to become an "unintended recipient" of $7,320.50 in workers' compensation benefits. U.S.S.G. § 2B1.1 app. note 3(C), 3(F)(ii). We will vacate the sentence imposed by the District Court, and we instruct the Court on remand to recalculate Tupone's total offense level under the Guidelines based on a "loss amount" of $7,320.50.

V.

Finally, as noted above, the parties jointly assert that Tupone's case should be remanded for resentencing pursuant to the Supreme Court's decision in *United States v. Booker*. As discussed in section IV.B., *supra*, we conclude that the case should be remanded for resentencing in light of the incorrect loss calculation. We further conclude that the Supreme Court's decision in *Booker* constitutes an independent ground for remand of this case, and that the post-*Booker*, advisory Guidelines regime – with the properly calculated offense level – should be applied at resentencing.

In *United States v. Davis*, 407 F.3d 162, 165 (3d Cir. 2005), we announced our intention to remand for resentencing

those cases in which sentence was imposed under the pre-*Booker* mandatory Guidelines regime, was enhanced pursuant to judge-found facts (other than the existence of prior convictions), and was challenged on direct appeal:

> Furthermore, as noted by the Court of Appeals for the Sixth Circuit, "[w]e would be usurping the discretionary power granted to the district courts by *Booker* if we were to assume that the district court would have given [defendant] the same sentence post-*Booker*." Failure to remand for resentencing, therefore, could adversely affect the fairness and integrity of the proceedings. Accordingly, defendants sentenced under the previously mandatory regime whose sentences are being challenged on direct appeal may be able to demonstrate plain error and prejudice. We will remand such cases for resentencing.*Id.* at 165. As the above language from *Davis* suggests, in order to qualify for resentencing under *Booker*, a defendant must object to his sentence at sentencing and reassert his argument on direct appeal. *See U.S. v. Ordaz*, 398 F.3d 236, 239 (3d Cir. 2005).

Tupone obviously preserved the sentencing issue at his sentencing hearing and now raises it on appeal before us. The Government agrees that remand is appropriate under *Booker*. The District Court imposed Tupone's sentence under the pre-

*Booker* mandatory Guidelines regime, and the Court enhanced Tupone's offense level based on facts found by the Court, rather than by the jury. The case is thus subject to *Booker* scrutiny and appropriate for remand on that ground.

## VI.

For the foregoing reasons, the District Court's conviction will be affirmed. We will vacate the sentence imposed by the District Court, and we will remand the case for resentencing.

STAPLETON, Circuit Judge, dissenting:

I agree with my colleagues that the Sentencing Commission intended the degree of punishment in situations of this kind to turn on what the defendant received that he was not entitled to receive rather than on the size of the transaction itself. Ironically, however, the Court's opinion, while giving effect to this judgment of the Commission, refuses to acknowledge an identical judgment of Congress reflected in a literal reading of the text of § 1920. For this reason, I respectfully dissent.

Section 1920 provides as follows:

Whoever knowingly and willfully falsifies, conceals, or covers up a material fact, or makes a false, fictitious, or fraudulent statement or representation, or makes or uses a false statement or report knowing the same to contain any false, fictitious, or fraudulent statement or entry in connection with the application for or receipt of compensation or other benefit or payment under subchapter I or III of chapter 81 of title 5, shall be guilty of perjury, and on conviction thereof shall be punished by a fine under this title, or by imprisonment for not more than 5 years, or both;

30

but if the amount of the benefits falsely obtained does not exceed $1,000, such person shall be punished by a fine under this title, or by imprisonment for not more than 1 year, or both.

18 U.S.C. § 1920.

Insofar as here relevant, the District Court read § 1920 to provide that "whoever knowingly and willfully . . . makes a false statement . . . in connection with the application for or receipt of compensation or other benefit or payment shall be guilty of perjury and . . . shall be punished by a fine . . . or imprisonment for not more than 5 years, or both, . . . but if the amount of the benefits . . . obtained does not exceed $1,000, such person shall be punished by a fine . . . or imprisonment for not more than one year, or both."

Congress could have enacted a coherent statute so providing, but it did not. Section 1920, as enacted by Congress, criminalizes precisely the conduct the District Court read it to criminalize, but when it came to punishment Congress did not make the degree of punishment turn on "the amount of the benefits obtained." Congress rather provided that the degree of punishment would turn on the quantum of wrongful conduct rather than the extent of the defendant's dependence on the

31

government, i.e., on "the amount of the benefits *falsely* obtained." 18 U.S.C. § 1920 (emphasis supplied).[9]

The District Court interpretation reads out of the statute entirely the word "falsely," thereby violating the rule of construction that no statutory text should be ignored as surplusage unless there is no other reasonable alternative. *See Bailey v. United States*, 516 U.S. 137, 146 (1995) (employing the canon to reject an interpretation of a criminal statute because "[n]othing here indicates that Congress, when it provided these two [different] terms, intended that they be understood to be redundant. We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning."); *United States v. Cooper*, 396 F.3d 308 (3d Cir. 2005) (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001),

---

[9] It is, of course, true that the "overall 'design' and 'object' of § 1920 is to criminalize the making of false statements in the application and receipt of government benefits" and the judge's instructions to the jury would have been entirely appropriate prior to the age of *Apprendi*. Op. at 12. I fail to perceive, however, how this "militates in favor of the District Court's reading of the statute." *Id.* The statute was enacted prior to *Apprendi*, and in that context, the relevant text clearly related only to the Court's sentencing decision. If that text had referred to "benefits obtained," the statute could fairly be read to limit the judge's punishment discretion by a reference back to "compensation, or other benefit or payment." Congress chose, however, to limit punishment in accordance with the amount of "benefits *falsely* obtained."

for the proposition that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant"). Here, the literal reading of the entire statute as written produces an eminently reasonable result. Indeed, I regard it as far more likely that Congress intended the punishment to turn on how much the defendant received that he was not entitled to rather than the size of the transaction itself. As I have indicated, this is precisely the same judgment reached by the Sentencing Commission as a result of its deliberations. *See* U.S.S.G. § 2B1.1, Application Notes § 3.(F)(ii) (For example, "if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50" for enhancement purposes.). In short, I would hold that § 1920 means what it literally says.

Even if it could be said that § 1920 was ambiguous, however, I would consider myself bound by the rule of lenity to construe the statute in a manner that would produce the lighter sentence in those cases where the two readings would produce different results. *United States v. $734,578.82 in U.S. Currency*, 286 F.3d 641, 657 (3d Cir. 2002) ("[W]here a statute is punitive in nature, the rule of lenity requires that any ambiguity in the statute be resolved in favor of the claimant."); *United States v. Fenton*, 309 F.3d 825, 828 n.3 (3d Cir 2002) ([W]here . . . the [Sentencing] Guidelines do not clearly call for enhancement, the rule of lenity should prevent the application of a significantly increased sentence.").

Because there was no determination by the jury as to whether "the amount of the benefits *falsely* obtained" by Tupone exceeded $1,000 and because there was testimony from Tupone on the basis of which a juror might have a reasonable doubt about whether that was the case, I would remand with instructions that Tupone should be resentenced to no more than a fine or imprisonment of one year, or both.