In the

# United States Court of Appeals
## For the Seventh Circuit

———————

No. 07-2117

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VICKIE L. WEBBER,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 06 CR 50015—**Philip G. Reinhard,** *Judge.*

———————

ARGUED NOVEMBER 2, 2007—DECIDED JULY 29, 2008

———————

Before EASTERBROOK, *Chief Judge*, and POSNER and RIPPLE, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Vickie L. Webber was charged with seven counts of making false statements to obtain federal employees' compensation benefits, in violation of 18 U.S.C. § 1920. A jury convicted her on all seven counts. The district court then sentenced Ms. Webber to five-months' imprisonment followed by three years of supervised release, the first five months of which are to be served under home confinement. The court also ordered Ms. Webber to pay $62,226.36 in restitution. Ms. Webber timely appeals her conviction and sentence.

For the reasons set forth in this opinion, we affirm Ms. Webber's conviction; we reverse that portion of the sentence requiring her to pay restitution in the amount of $62,226.36 and remand the case to the district court for further proceedings consistent with this opinion.[1]

# I

# BACKGROUND

## A. The Facts Presented at Trial and Ms. Webber's Conviction

Ms. Webber began working as a rural letter carrier for the United States Postal Service ("USPS") in 1986. In 2000, Ms. Webber submitted a claim for benefits under the Federal Employees' Compensation Act ("FECA"). Her claim for benefits was based on problems that she began having with her hands and wrists due to the repetitive nature of her mail sorting duties prior to beginning her mail route.

FECA provides compensation to federal employees for injuries sustained during the performance of their duties. Under FECA, federal employees who are totally disabled and have at least one dependent receive 75% of their federal salary. An employee is totally disabled if she has no capacity to earn any wages or work in any position. Partially disabled employees receive 75% of their federal salaries minus their wage-earning capacity. An employee is classified as partially disabled if she is unable to return to the position held at the time of the injury but nevertheless has limited ability to perform other work.

---

[1] The district court exercised jurisdiction under 18 U.S.C. § 3231. Our jurisdiction is predicated on 28 U.S.C. § 1291.

FECA claims are administered by the Office of Workers' Compensation Programs ("OWCP") in the Department of Labor. To receive FECA benefits, a disabled federal employee must submit a "Claim for Compensation," Form CA-7, for each period during which the employee seeks benefits. If OWCP determines that an employee is likely to remain disabled for a considerable period of time, OWCP places the person on the "periodic rolls." Such employees are relieved of the obligation to file CA-7 forms; however, they are required to submit Form 1032 on an annual basis. OWCP uses these forms to determine an employee's wage-earning capacity and the amount of benefits to which an employee is entitled, to reevaluate an employee's disability determination and to ascertain whether an employee would benefit from vocational rehabilitation counseling.

Form CA-7 contains the following question: "Have you worked outside your federal job during the period(s) claimed in Section 2? (Include salaried, self-employed, commissioned, volunteer, etc.)." R.94, Ex. 1. If an employee answers "yes" to this question, she is directed to provide additional information, such as the name and address of the business at which she was employed, the dates worked and the type of work performed.

Form 1032 contains the following questions: (1) "Did you work for any employer during the past 15 months?"; (2) "Were you self-employed or involved in any business enterprise in the past 15 months?"; and (3) "If you answered 'No' to both questions 1 and 2, state whether you were unemployed for all periods during the past 15 months?" R.94, Ex. 5. Again, an employee who answered questions (1) or (2) affirmatively is directed to provide supplemental information about where she worked and

what type of work she did. Immediately preceding these questions is an instructions section, explaining in detail the type of work that triggers the reporting requirement. Two paragraphs in this instruction area explain:

> **Report ALL self-employment or involvement in business enterprises.** These include but are not limited to: farming, sales work, operating a business, including a store or a restaurant. . . . Report activities such as keeping books and records, or managing and/or overseeing a business of any kind, including a family business. Even if your activities were part-time or intermittent, you must report them.
>
> . . . .
>
> **Report ANY work or ownership interest in any business enterprise,** even if the business lost money or if profits or income were reinvested or paid to others. If you performed any duties in any business enterprise for which you were not paid, you must show as rate of pay what it would have cost the employer or organization to hire someone to perform the work or duties you did, even if your work was for yourself or a family member or relative. . . .

R.94, Ex. 5 at 1 (emphasis in original).

On December 14, 2000, OWCP accepted Ms. Webber's FECA claim regarding her condition of carpal-tunnel syndrome. OWCP paid Ms. Webber a total of $12,043.58 in FECA lost wages benefits from January 17, 2001 through June 8, 2001. During this period, Ms. Webber submitted to OWCP eleven CA-7 forms. On each of these eleven forms, Ms. Webber answered "no" to the question, "Have you worked outside your federal job during the period(s) claimed?" R.83 at 81-82. In June 2001, Ms. Webber's

physician authorized her to return to work. The USPS gave her a limited duty assignment to accommodate her medical condition.

On June 5, 2002, Ms. Webber submitted another claim for FECA benefits. Ms. Webber stated that she had reflex sympathetic disorder, as well as carpal-tunnel syndrome; she further stated that she was unable to perform her duties without assistance due to extreme pain and limited ability to move her hands.[2] On November 18, 2002, OWCP again accepted Ms. Webber's claim and determined that she was totally disabled. OWCP paid Ms. Webber FECA lost wages benefits for the periods between June 10, 2002 and June 26, 2002 and between December 6, 2002 and the start of trial. Ms. Webber received a total of $127,986.78 in benefits. From January 25, 2003 through April 25, 2003, Ms. Webber submitted to OWCP four CA-7 forms, again answering "no" to the outside work question. R.94, Ex. 1-4. On April 20, OWCP placed her on the periodic rolls. Thereafter, Ms. Webber submitted to OWCP three 1032 forms; Ms. Webber answered "no" to questions (1) and (2) on each of those forms. R.94, Ex. 5-7.

─────────────

[2] At trial, Ms. Webber introduced testimony about her illness and medical history. Starting in 2002, she received a series of injections to treat her pain. When the injections did not work, she underwent a surgical procedure in which her physician implanted a spinal cord stimulator in her back. She developed an infection as a result of the surgery, and the stimulator was removed. In March 2004, the physician successfully implanted the device. In December 2004, Ms. Webber underwent another surgical procedure in which the physician implanted an intrathecal drug delivery system, which involves the implantation of a catheter that is attached to an external pump. The device delivers pain medication.

On April 17, 2000, about seven months before the OWCP accepted her claim for FECA benefits for carpal-tunnel syndrome, Ms. Webber obtained a county business ownership certificate for a business known as Clearview Pond and Garden ("Clearview"). Clearview was a retail business that sold plants, pond supplies and Koi fish. The business was located on a rural, five-acre tract of land in Byron, Illinois, where Ms. Webber resided with her family. Ms. Webber also registered Clearview in her own name with the Illinois Department of Revenue and received a special-use permit from the Ogle County Zoning Commission authorizing her to conduct a business on her property.

In 2001, a fifty-foot-long greenhouse was constructed on Ms. Webber's property, which was used for Clearview's business operations. Plants with price tags were placed in three long rows running down the middle and sides of the greenhouse; plants with price tags also were placed on tables outside of the greenhouse. There was a cash register inside the greenhouse, and two large tubs of Koi fish were positioned outside.

On January 29, 2001, Ms. Webber submitted on behalf of Clearview an application to International Pond Supply, Inc. ("IPS"), in Sante Fe, New Mexico. The application was for a contract with IPS to purchase pond supplies at wholesale prices and then resell those products at retail prices. On April 2, 2001, Ms. Webber submitted an application to the Ogle County Zoning Commission requesting permission to erect signs for Clearview on two other properties in Byron, Illinois. A few months later, in June 2001, she purchased ten advertising spots for Clearview on WFEN radio in Rockford, Illinois. On July 2, 2003, Ms. Webber submitted to a corporation an application to be treated as a wholesaler. In that application, Ms. Webber

stated that Clearview's sales for 2002 totaled $40,000 and projected that Clearview's total sales for 2003 would reach $50,000.

Ms. Webber had business cards stating that Clearview was open Tuesday through Saturday from 9:00 a.m. to 5:00 p.m. and Sunday from 9:00 a.m. to 4:00 p.m. The Government introduced evidence at trial showing that, during 2003 and 2004, Ms. Webber managed Clearview's finances. During the months of May, June and July of 2003, Ms. Webber wrote and signed all sixty-four checks drawn on Clearview's business account; she wrote and signed all but one of the fifty checks drawn on that account from April through October of 2004. Also during this period, Ms. Webber ordered a substantial portion of Clearview's plant and Koi fish inventory. IPS records indicate that Ms. Webber placed fourteen of seventeen orders made by the business in 2003 and 2004. Ms. Webber also placed several fish orders with another distributor during the same period.

In 2003, Ms. Webber met with Linda Rosquist, the owner of Goldigger Perennials, a plant wholesaler. During this meeting, Ms. Webber, Rosquist and Julie Keller, a Clearview employee, discussed prebooking Clearview's plant order for the following year. Ms. Webber made the final decisions about which plants Clearview would order. Ms. Webber made seven trips to Arkansas in 2003 and 2004 to pick up plant and other inventory, as well as several trips to O'Hare airport in Chicago to pick up fish inventory.

In August 2003, USPS Injury Compensation Specialist Jim Johnson called Ms. Webber's telephone number and heard an answering machine greeting for Clearview. Johnson informed the USPS Inspection Service and, on August 25,

2003, Postal Inspector James Husarik went to Clearview.[3]
Ms. Webber approached Inspector Husarik and asked if
she could help him. He stated that he was interested in
purchasing some plants for his yard. Ms. Webber walked
with Inspector Husarik around Clearview, showed him
various plants and answered his questions. Ms. Webber
told Inspector Husarik, whom she believed was a cus-
tomer, that she was usually at Clearview during its normal
business hours and that she recently had hired a new
employee named Julie Keller. Ms. Webber suggested that
Inspector Husarik give her a diagram of his backyard so
that she could help him with his landscaping. Once the
Inspector agreed to purchase a plant, Ms. Webber picked
up the plant, carried it to the cash register, rang up the
sale, bagged the plant and handed it to him. He explained
that he would return with his cousin, who knew more
about plants.

On August 26, 2003, Inspector Husarik returned with
Inspector Kurt Kamradt. Ms. Webber was not present. The
Inspectors returned later in the day, and, this time, Ms.
Webber and her husband, Tom Webber, were present.
Inspector Husarik gave Ms. Webber the diagram that she
had requested. Ms. Webber took the Inspectors around
Clearview, and she suggested various plants. While she did
so, Ms. Webber told the Inspectors that she handled the
plant portion of the business and that her husband handled
the ponds. Ms. Webber also stated that, in wintertime,
she buys most of the plants that were sold at Clearview,
starts them out as plugs in her basement and then transfers
them to the greenhouse. She mentioned that she frequently

---

[3] All of the undercover visits were video recorded. The videos
were played for the jury during the trial.

traveled to Arkansas to pick up Koi fish. Ms. Webber and her husband collected the plants that the Inspectors had agreed to purchase and brought them back to the cash register. Ms. Webber rang up the sale.

On October 6, 2004, Postal Inspectors Eileen Roberts and Alvin Dvorak went to Clearview posing as husband and wife. Ms. Webber met with them and asked them to return with a diagram of their property. On October 14, Inspector Roberts returned, and Ms. Webber directed her to Keller, the employee Ms. Webber had hired.

On February 17, 2005, Inspectors Kamradt and Husarik returned to Clearview, identified themselves as Postal Inspectors and told Ms. Webber that they wanted to interview her about her injury compensation claim. Ms. Webber, who did not recognize the Inspectors from their previous undercover visits, initially told the Inspectors that she was unable to work at Clearview because of her condition and that her husband was the sole owner of Clearview. She explained that her husband ordered all of the plants and fish sold at Clearview, although she some-times would offer her opinion as to which flowers he should purchase. The Inspectors told Ms. Webber that they thought she was being untruthful about her involvement in Clearview. As this point, Ms. Webber's husband, Tom Webber, walked into the room; the Inspectors asked him who owned Clearview. Tom said that Ms. Webber owned the business. Ms. Webber corrected him and told him that the business was in his name. The Inspectors asked Ms. Webber what Keller would say if they were to ask her about Ms. Webber's involvement in the business; she conceded that Keller probably would say that Ms. Webber was active in and ran the business.

At trial, Ms. Webber testified that she believed that she had answered accurately the questions on the CA-7 and

1032 forms. She stated that she had not considered her involvement in Clearview to be self-employment because no one would have paid her for her work there. Ms. Webber also testified that, prior to filling out the forms, she had called Jim Johnson and explained that she had a family business. According to Ms. Webber, Johnson asked her whether she received a wage, to which she answered, "no"; he told her "not to worry about it." R.87 at 851. Johnson denied ever saying this.

Ms. Webber testified about her physical condition. She explained that her pain medication made her drowsy and prevented her from doing much of anything. According to Ms. Webber, her friend, Julie Keller, volunteered to run the operation for her. Ms. Webber also testified that her boss at the Byron Post Office, Jeff Engestrom, and other USPS employees knew of the existence of Clearview and that she never had tried to conceal her involvement in, or the existence of, Clearview. Finally, Ms. Webber's daughter and two of her former neighbors testified that, from their personal observation, Ms. Webber was unable to perform any physical activity and was often confused as a result of her illness and medication.

A jury convicted her of seven counts of making false statements to obtain federal employees' compensation benefits in violation of 18 U.S.C. § 1920.

## B. Sentencing Proceedings

The district court sentenced Ms. Webber to serve five months' imprisonment in the custody of the Bureau of Prisons and three years of supervised release, the first five months of which would be served under home confinement. The court further sentenced Ms. Webber to pay

$62,226.36 in restitution, a fine of $2,000 and a special assessment. Ms. Webber is appealing her sentence only with regard to the order of restitution. We therefore shall focus our discussion of the facts accordingly.

To determine Ms. Webber's sentence under the advisory guidelines, the district court had to calculate the total amount of loss that Ms. Webber's offense had entailed. This determination required ascertaining what Ms. Webber's wage-earning capacity had been during the period for which she had received FECA benefits and subtracting that amount from the total amount of benefits that she actually had received; the resulting figure was the amount of benefits that Ms. Webber had obtained as a result of her fraudulent answers.[4] At the first of three sentencing hearings, the Government indicated to the court that it had calculated the resulting amount to total $50,632.07. The Government obtained this figure by conducting a "labor market survey," undertaken by the Department of Labor, in which other businesses were contacted to determine how much money an individual like Ms. Webber could earn. Ms. Webber objected to the survey; she claimed that an investigation had revealed that many of the businesses included within the survey actually had not been contacted and that many of the businesses were not comparable to Clearview. The district court stated that, after having read

---

[4] *See* U.S.S.G. § 2B1.1(b)(1); *id.* cmt. 3(F)(ii) ("In a case involving government benefits . . . loss shall be considered to be not less than the value of the benefits obtained by unintended recipients or diverted to unintended uses, as the case may be. For example, if the defendant was the intended recipient of food stamps having a value of $100 but fraudulently received food stamps having a value of $150, loss is $50.").

the report, it was inclined to agree with Ms. Webber that many of the businesses were not sufficiently comparable to Clearview to be probative of Ms. Webber's wage-earning capacity. The district court further indicated its preliminary belief that the Government would have a difficult time showing that Ms. Webber's wage-earning capacity was between $30,000 and $70,000. The court, however, continued the hearing until May 3, 2007 to allow Ms. Webber's counsel to prepare to cross-examine the author of the survey.

At the May 3 hearing, the court heard arguments from both sides as to the labor market survey and as to the amount of loss. Ultimately, the court determined that the labor market survey, though relevant, had little probative value because of the substantial differences between the businesses surveyed and Clearview. It further found that Ms. Webber had done valuable work for Clearview and that the business could not have functioned without her. It found, however, that Ms. Webber was in pain during this time, that she had been away from the business frequently for medical treatment and operations, and that her condition did limit the amount of work that she could perform. Recognizing the imprecise nature of the task at hand but that it nevertheless had to make a reasonable estimate of the loss amount, the district court calculated the loss to be $10,400. It reached this figure by assuming that Ms. Webber had made eight dollars an hour working on a part-time basis for five hours per day for five days a week, equaling $200 per week. It multiplied this figure by twenty-six weeks, and multiplied that by the two year period covered in the indictment, equaling a total loss of $10,400. The court recognized that its calculation was "very imprecise" and that

> [t]he defendant's services, in my opinion were much higher than that. I haven't put a calculation on it, but certainly for all—she worked in the off season when they weren't open, and, therefore, a lot more hours could be attributed there, and she worked not just as a clerk. But I've used that sort of as a minimum benchmark . . . .

R.90 at 45. The court accordingly calculated Ms. Webber's advisory guidelines sentence based on a loss amount between $10,000 and $30,000. It sentenced her to five-months' imprisonment and three years of supervised release, the first five months of which would be served under home confinement.

The district court then heard arguments on the issue of restitution. The Government asked the court, pursuant to 20 C.F.R. § 10.529, a federal regulation issued under FECA, to impose restitution for the entire amount of benefits that Ms. Webber had received ($62,226.36), rather than just the amount that she had obtained as a result of her fraudulent answers. Ms. Webber objected, arguing that restitution could not be imposed beyond the loss amount to the victim, here, the Government. After continuing the hearing until May 9 to consider the issue, the district court, relying on *United States v. Harms*, 442 F.3d 367 (5th Cir. 2006), determined that it would impose restitution in the amount of $62,226.36, the full amount of benefits paid to Ms. Webber.

## II

## DISCUSSION

### A. Construction of 18 U.S.C. § 1920

Ms. Webber contends that the Government failed to

establish a felony violation of 18 U.S.C. § 1920 because it did not allege in the indictment or prove beyond a reasonable doubt that the benefits that she "falsely obtained" exceeded $1,000. Because this contention raises a question of statutory interpretation, our review is plenary. *United States v. Lapi*, 458 F.3d 555, 562 (7th Cir. 2006).

Section 1920 of Title 18 provides:

> Whoever knowingly and willfully falsifies, conceals, or covers up a material fact, or makes a false, fictitious, or fraudulent statement or representation, or makes or uses a false statement or report knowing the same to contain any false, fictitious, or fraudulent statement or entry in connection with the application for or receipt of compensation or other benefit or payment under subchapter I or III of chapter 81 of title 5, shall be guilty of perjury, and on conviction thereof shall be punished by a fine under this title, or by imprisonment for not more than 5 years, or both; but if the amount of the benefits falsely obtained does not exceed $1,000, such person shall be punished by a fine under this title, or by imprisonment for not more than 1 year, or both.

Ms. Webber invites our attention to the second clause of section 1920. In her view, the words "but if the amount of the benefits falsely obtained does not exceed $1,000" create an essential element of felony liability. To prove felony liability, Ms. Webber contends, the Government must allege in the indictment and prove beyond a reasonable doubt to the trier of fact that the benefits that the defendant obtained through the use of false statements exceeded $1,000. She submits that the Government failed to satisfy both of these requirements and, consequently, "failed to prove felony liability." Appellant's Br. at 14. Accordingly, Ms. Webber requests that we vacate her felony convictions and remand the case for the imposition of a misdemeanor

sentence. *Id*.

The principles that must guide our inquiry are well settled but worth repeating. In analyzing the language of a statute, we give the words their ordinary meaning unless the context counsels otherwise. *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991) (explaining that "statutory language must always be read in its proper context"). When the plain wording of the statute is clear, that is the end of the matter. *BedRoc, Ltd. v. United States*, 541 U.S. 176, 183 (2004) (noting that the task of statutory interpretation "ends there [if] the text is unambiguous"). The "plain meaning" of a statute, however, is often illuminated not only by its language but also by its structure. *Alexander v. Sandoval*, 532 U.S. 275, 288 (2001); *Marie O. v. Edgar*, 131 F.3d 610, 622 (7th Cir. 1997). "Context, not just literal text, will often lead a court to Congress' intent in respect to a particular statute." *City of Rancho Palos Verdes v. Abrahams*, 544 U.S. 113, 127 (2005) (Breyer, J., concurring); *Dersch Energies, Inc. v. Shell Oil Co.*, 314 F.3d 846, 856 (7th Cir. 2002) (noting that a statute must be "construed in its proper context").

Whether it is necessary for the Government to plead and prove that its loss was in excess of one thousand dollars is, given the current state of the law, not an easy question. On the one hand, when section 1920 is read in its entirety, both the language and the structure of the statute indicate quite clearly that the overall design and object of the statute is "to criminalize the making of false statements in the application for and receipt of government benefits." *United States v. Tupone*, 442 F.3d 145, 151 (3d Cir. 2006). The first clause of the statute makes it a felony to employ any of the fraudulent acts enumerated in that clause in order to obtain from the United States any compensation, other benefit or payment provided under the provisions set forth in the statute. The maximum term of imprisonment is five

years. The second clause of section 1920 seems most easily read as an exception to the first clause. Set off only by a semicolon from its predecessor, this second clause point-edly begins: "but if . . . ." Under its terms, if it is established that the amount "falsely obtained" from the United States is less than one thousand dollars, the permissible maxi-mum term of imprisonment is one year.

To read the statute as creating a misdemeanor with a narrow exception for felony liability when the amount at issue is in excess of one thousand dollars requires that, literally and figuratively, the statute be stood on its head. As our colleagues in the Third Circuit noted:

> An examination of the Federal Criminal Code reveals such a structure to be highly atypical [sic] among criminal statutes—especially those dealing with fraud, theft, or false statements—that provide for both felony and misdemeanor offenses. In fact, numerous sections of the criminal code mirror the precise linguistic pattern found in § 1920. *See, e.g.*, 18 U.S.C. §§ 655, 656, 1003, 1025. The above code sections and those like them all include the same structural elements: a lengthy primary clause describing certain illegal conduct and providing for felony punishment thereof; a semicolon; and, finally, a second clause—beginning with the word "but"—which refers back to the illegal conduct de-scribed in the main clause and provides for misde-meanor punishment in cases where the dollar value associated with the aforementioned illegal conduct does not exceed $1000. *See, e.g.*, *id.* In other words, the above statutes are felony criminal statutes that include a narrow misdemeanor exception in the event that the illegal conduct results in *de minimus* gain.
>
> We reject the argument that, unlike all other identi-cally structured provisions in the Federal Criminal

Code, § 1920 alone primarily establishes a misde-
meanor and creates a narrow "felony exception" that
turns on an undefined, two-word phrase, and that
requires a calculation nowhere mentioned or implied
in the text. The much more natural and obvious read-
ing of § 1920 is that the main "effect" of the text is to
create the *felony* of making false statements related to
government benefits, and to carve out a narrow misde-
meanor exception for those defendants whose false
statements relate to applications for or receipt of
*de minimus* benefits and dollar amounts.

*Tupone*, 442 F.3d at 152 (footnote omitted) (emphases in
original).[5]

Given the language and structure of the statute, it is not
surprising that two of our sister circuits have concluded,
albeit without extensive discussion, that the amount of the
benefits falsely obtained is not a substantive element of the
offense but a statutorily mandated punitive sentencing
factor. *See United States v. Henry*, 164 F.3d 1304, 1307 (10th
Cir. 1999); *United States v. Grillo*, 160 F.3d 149, 150 (2d Cir.

---

[5] Although we see merit in the general interpretative methodol-
ogy employed by the Third Circuit, we do not want to be
understood as necessarily approving of the intimation that, to
obtain a sentence of imprisonment greater than one year under
*Apprendi v. New Jersey*, 530 U.S. 466 (2000), the jury must find
only that the *entire* amount of benefits obtained from the
Government exceeded $1,000, rather than the amount that could
be attributed to the false statement. *Compare United States v.
Tupone*, 442 F.3d 145, 150 n.3, 151-52 (3d Cir. 2006) (reading the
phrase "benefits falsely obtained" as being synonymous with the
phrase "in connection with"), *with id.* at 157-58 & n.9 (Stapleton,
J., dissenting).

1998) (per curiam).[6] We think that there is much to recommend this approach. We note that in interpreting a statute with the same operative language and structure, *see* 18 U.S.C. § 641,[7] we have assumed that there the amount of loss is not an element of the offense. *See United States v. Howard*, 30 F.3d 871, 875 (7th Cir. 1994).[8] In the statute before us, the core prohibited conduct is stated clearly in the principal clause of the statute: obtaining a government benefit through a false statement. The second subsidiary

---

[6]  No other circuits have ruled definitively on the matter.

[7]  Section 641 provides:

> Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or
>
> Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—
>
> Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.
>
> The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. § 641.

[8]  As we point out, however, this position is a minority view. *See* note, *infra*, 10.

clause does not "complete the thought." *Jones v. United States*, 526 U.S. 227, 233 (1999).[9] The first clause containing the prohibition stands on its "own grammatical feet," thanks to the phrase "shall be punished." *Id.* at 233-34.

Although the language and the structure of the statute counsel in favor of treating the matter of loss as a sentencing consideration rather than an element of the offense, we must acknowledge that a significant body of case law interpreting other statutes with the same language and structure, has held that, in order to obtain a felony conviction, it *is necessary* for the Government to set forth in the indictment and prove beyond a reasonable doubt that the amount in question is greater than the amount stated in the statutory text.[10] Indeed, the Third Circuit, whose reading of section 1920 does not require proof of the amount in order

---

[9] *Cf. Carter v. United States*, 530 U.S. 255, 272-73 (2000) (holding that value is an element for purposes of 18 U.S.C. § 2113(b) because the first paragraph "requires that the property taken have 'value exceeding $1,000' " *and* the second paragraph "refers to property of 'value not exceeding $1,000,' " thus "describ[ing] [two] distinct offenses"). *See generally McMillan v. Pennsylvania*, 477 U.S. 79, 91 (1986) (holding "that States may treat 'visible possession of a firearm' as a sentencing consideration rather than an element of a particular offense"); *United States v. Smith*, 223 F.3d 554, 562-66 (7th Cir. 2000) (discussing *McMillan* and its progeny).

[10] *United States v. Robie*, 166 F.3d 444, 449 (2d Cir. 1999) (interpreting 18 U.S.C. § 641) (citing *Theriault v. United States*, 434 F.2d 212, 214 (5th Cir. 1970)); *United States v. Seaman*, 18 F.3d 649, 650 (9th Cir. 1994); *United States v. Wilson*, 284 F.2d 407, 408 (4th Cir. 1960); *see also United States v. Sargent*, 504 F.3d 767, 771 (9th Cir. 2007) (18 U.S.C. § 1707); *United States v. Parisien*, 413 F.3d 924, 926 (8th Cir. 2005) (18 U.S.C. § 661).

to obtain a felony conviction, *see Tupone*, 442 F.3d at 152, has taken the opposite position with respect to 18 U.S.C. § 659,[11] a statute similar in relevant language and structure. *See United States v. Scanzello*, 832 F.2d 18, 23 (3d Cir. 1987).

We need not decide this issue definitively in this case. Harmless error analysis applies when a district court's jury instructions omit an element of an offense. *See Neder v. United States*, 527 U.S. 1, 9-10 (1999); *United States v. Matthews*, 505 F.3d 698, 707 (7th Cir. 2007); *see also Chapman v. California*, 386 U.S. 18, 24 (1967) (holding that a federal

---

[11] Section 659 provides, in relevant part:

> Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, trailer, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air cargo container, air terminal, airport, aircraft terminal or air navigation facility, or from any intermodal container, trailer, container freight station, warehouse, or freight consolidation facility, with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; . . . .

> Shall be fined under this title or imprisoned not more than 10 years, or both, but if the amount or value of such money, baggage, goods, or chattels is less than $1,000, shall be fined under this title or imprisoned for not more than 3 years, or both.

18 U.S.C. § 659. We note that section 659 separates the two permissible punishments with a comma rather than a semicolon.

constitutional error is harmless if it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained"). There never has been any serious contention that any of the falsities set forth in any of the counts resulted in a loss to the United States of less than one thousand dollars.[12] Therefore, each of the counts clearly resulted in a felony conviction.[13]

---

[12] Counts one, two and four charged Ms. Webber with submitting false CA-7 forms claiming FECA benefits for four-week intervals between January 25, 2003, and May 2, 2003; count three covers a two-week period between March 22, 2003, and April 4, 2003. For the conduct charged in counts one, two and four, Ms. Webber received benefits in the amount of $2,515.52, and for the conduct charged in count three she received $1,257.76. Counts five through seven charged that Ms. Webber submitted 1032 forms on December 8, 2003, March 4, 2003, and December 13, 2004, providing information regarding the previous 15 months; for each of these counts, Ms. Webber received, excluding the periods previously reported on CA-7 forms, at least approximately $17,600, $7,545 and $23,000, respectively. The Government's evidence at trial establishes beyond a reasonable doubt that Ms. Webber falsely obtained in excess of $1,000 for each of these counts. We also note that Ms. Webber did not dispute these figures at trial.

[13] We have determined that Ms. Webber was convicted of a felony, and, therefore, it is unnecessary to reach her argument that, although the court sentenced her leniently, she must be re-sentenced because the district court might have imposed even less of a sentence if it had known that her crime was a misdemeanor.

The district court correctly determined that Ms. Webber had committed felonies, and, consequently, the three-year term of supervised release was legally permissible. *See* 18 U.S.C.

(continued...)

   Although the district court, properly exercising its discretion, determined that the appropriate sentence of confinement on each count should be less than one year, the imposition of these lenient sentences did not render these convictions misdemeanors. Although the sentence for each count is within the range permitted for a loss of under one thousand dollars, the plain wording of the statute makes clear that the applicability of the statutory one-year limitation is triggered by the amount falsely obtained from the United States, not by the final sentence imposed. That limitation on punishment is applicable only when the amount falsely obtained from the Government "does not exceed $1,000." 18 U.S.C. § 1920.

   In sum, with respect to each of the counts, Ms. Webber falsely obtained benefits from the United States that exceeded one thousand dollars. She was found guilty under a statute that makes such conduct a felony and sets the maximum term of imprisonment at five years. The district court, despite that maximum, chose to impose only a sentence of five-months' imprisonment and supervised release, including a period of home confinement. Therefore, any error flowing from the failure of the indictment to allege that the amount of loss was in excess of one thousand dollars or from the omission of an instruction requir-

---

[13] (...continued)
§ 3583(b)(2) (authorizing a term of supervised release of "not more than three years" for a "Class D felony"); 18 U.S.C. § 3559(a)(4) (categorizing crimes for which the authorized sentence of imprisonment is "less than ten years but five or more years" as a "Class D felony"); 18 U.S.C. § 1920 (authorizing a sentence of imprisonment of "not more than 5 years"); *see also* U.S.S.G. § 5D1.2(a)(2).

ing a jury finding on the amount of loss was harmless beyond a reasonable doubt.

## B. Sufficiency of the Evidence as to Willfulness

Ms. Webber submits that the Government did not introduce sufficient evidence from which a reasonable jury could conclude that she willfully made false statements to obtain FECA benefits. A defendant making an insufficiency of the evidence argument faces a difficult task. *See United States v. Pulido*, 69 F.3d 192, 205 (7th Cir. 1995) (characterizing the burden as a "nearly insurmountable hurdle"). In reviewing a challenge to the sufficiency of the evidence, we do not weigh the evidence, *United States v. Bowman*, 353 F.3d 546, 552 (7th Cir. 2003), make credibility determinations, *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999), or resolve testimonial inconsistencies, *see United States v. Hodges*, 315 F.3d 794, 799 (7th Cir. 2003). The court, taking the evidence in the light most favorable to the Government, "will overturn a conviction based on insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Stevens*, 453 F.3d 963, 965 (7th Cir. 2003).

Section 1920 requires proof that the false statement was made "willfully." *See* 18 U.S.C. § 1920. The district court instructed the jury that "an act is done willfully if done voluntarily and intentionally and with intent to do something the law forbids." R.88 at 1084.[14] Absent direct proof

---

[14] *See United States v. Markowski*, 772 F.2d 358, 364 (7th Cir. 1985); *United States v. Patrick*, 542 F.2d 381, 388-89 (7th Cir. 1976); *see*

(continued...)

of willfulness, a rare situation, the Government may prove willfulness through circumstantial evidence. *United States v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002).[15]

Ms. Webber submits that the evidence at trial demonstrates that, although the business did exist on her premises and although she participated in some activities with respect to it, her response to the questions was not *willfully* false because she had a solid basis for believing that, given her medical condition, she was answering the questions truthfully. She asks us to read the record as demonstrating that she participated in activities only on very discrete occasions during a period when her overall medical condition prevented her from the sort of regular and sustained activity required to operate such a business. She notes that, during the period in question, she suffered from severe medical ailments that her physician described as debilitating to the point that they rendered her "pretty much non-functional." Appellant's Br. at 16.

It was, of course, the duty of the jury to evaluate this argument. While the jury had before it Ms. Webber's view of the situation, it also had before it the Government's evidence that, in spite of her medical illnesses, Ms. Webber controlled Clearview: She managed Clearview's finances; contracted with advertisers; completed and submitted wholesale and credit applications; ordered plant inventory; ordered fish inventory; picked up plant and fish inventory, which required long distance trips; waited on customers;

---

[14] (...continued)
*also* Pattern Crim. Fed. Jury Instructions for the Seventh Circuit 4.09, *available at* http://www.ca7.uscourts.gov/pjury.pdf.

[15] *See also United States v. Frokjer*, 415 F.3d 865, 869 (8th Cir. 2005).

drew up landscape plans for customers; and rang up sales on the cash register. In light of this evidence, the jury certainly was entitled to reject the characterization that Ms. Webber offered of her medical condition. For instance, the jury had every right to reject as biased her own testimony, and that of her daughter and her neighbors, that she was too sick to work at Clearview.

Indeed, the jury had a solid basis for rejecting Ms. Webber's testimony. The jury heard the testimony of Postal Inspectors Kamradt and Husarik, who explained that Ms. Webber had provided inconsistent and false answers when the Inspectors asked her about her involvement with Clearview. Ms. Webber initially stated that she was unable to work at Clearview because of her condition, that Clearview was her husband's business and that he was its sole owner. The Inspectors specifically told Ms. Webber that they thought that she was being untruthful about her involvement in Clearview. Despite the Inspectors' warning and her husband's admission that she owned the business, Ms. Webber continued to maintain that she neither owned nor was involved with Clearview. When the Inspectors subsequently asked Ms. Webber what Julie Keller, a Clearview employee, would say if they were to ask her about Ms. Webber's involvement in the business, she admitted that Keller would say that Ms. Webber was active in and ran the business. Ms. Webber's attempt to conceal her ownership and management of Clearview is circumstantial evidence of her consciousness of guilt. *See United States v. Rajewski*, 526 F.2d 149, 158 (7th Cir. 1975) (explaining that "[i]t is well settled that untrue exculpatory statements may be considered as circumstantial evidence of the defendant's consciousness of guilt").

We also must stress that OWCP's forms unambiguously explained the information regarding outside work that Ms. Webber had an obligation to disclose. The form stated that an applicant must "**[r]eport ALL self-employment or involvement in business enterprises**" and explained that this disclosure must include, although not be limited to, "sales work, operating a business, including a store or a restaurant." R.94, Ex. 5 at 1 (emphasis in original). The form further provided: "Report activities such as keeping books and records, or managing and/or overseeing a business of any kind, including a family business. Even if your activities were part-time or intermittent, you must report them." *Id.*

These blunt, pointed statements make Ms. Webber's claim that she did not believe that she was "meaningfully connected" with Clearview and, indeed, had minimal "involvement in it," Appellant's Br. at 17, beside the point. The language of the OWCP's forms required specific information. They did not invite Ms. Webber to engage in self-evaluation; rather, they presented information for the Postal Service's evaluation under its established procedures. Similarly, her reliance on the fact that she had disclosed freely the existence of Clearview to some of her coworkers at the Byron, Illinois Post Office does not excuse her obligations to answer the questions on the form with complete candor. Her obligation was to be completely truthful to those officials responsible for making a decision with respect to her FECA claim.

From the totality of this evidence, the jury was entitled to conclude, beyond a reasonable doubt, that Ms. Webber had acted voluntarily, intentionally and with intent to do something the law forbids when she provided materially false information to the OWCP.

**C. Improper Jury Instructions**

Ms. Webber contends that the district court improperly instructed the jury to disregard evidence relevant to whether she acted willfully. We review de novo whether a district court's jury instructions "fairly and accurately summarize[] the law." *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003). In conducting such a review, we consider the jury instructions in their entirety, rather than in "artificial isolation." *United States v. Westmoreland*, 122 F.3d 431, 434 (7th Cir. 1997); *see also United States v. Collins*, 223 F.3d 502, 508 (7th Cir. 2000). The focus of our inquiry is whether the jury had a "complete understanding of the issues" and of the law governing those issues. *United States v. Kelly*, 167 F.3d 1176, 1179 (7th Cir. 1999). If the district court gave an erroneous instruction, we shall reverse "only if the jury's comprehension of the issues was so misguided that it prejudiced the complaining party." *United States v. Smith*, 103 F.3d 600, 606 (7th Cir. 1996) (internal quotation marks and citation omitted).

Ms. Webber submits that the district court improperly instructed the jury to disregard evidence relevant to her intent when it admonished the jury several times that evidence that certain Byron postal employees knew of the existence of Clearview was not a defense in the case. The district court's admonishments, according to Ms. Webber, were too broad. Specifically, during Ms. Webber's counsel's direct examination of Ella Rose, a Byron Post Office employee, the court instructed the jury: "[J]ust because [Rose] as a postal employee knew that the defendant was engaged in this type of business is not a defense to the case. It may be relevant to other issues, but it's not a defense." R.86 at 543. Similarly, during Ms. Webber's counsel's direct examination of Jeff Engstrom, the postmaster at the Byron

Post Office, the court stated: "Again, whether this witness or other witnesses knew that she had this business or not is not a defense in the case. It may be relevant for other purposes." *Id.* at 654. Counsel explained, "I offer it for her mental state, Judge, and her intent." *Id.* The court responded, "That we'll reach. I said maybe for other purposes." *Id.* In its final jury instructions, the court explained that actual knowledge "by the government is not a defense to the materiality element."[16] R.54 at 3.[17]

Ms. Webber claims that the two instructions that the court gave to the jury during the trial were overbroad because whether Byron postal employees knew about Clearview was relevant to and probative of her willfulness. In her view, it is less likely that, knowing that other postal employees knew about Clearview's existence, she would lie willfully about its existence on OWCP forms.

We agree with Ms. Webber that evidence that she had not concealed Clearview's existence from Byron postal employ-

---

[16] "A material statement is one that has a natural tendency to influence, or that is capable of affecting, a government function." *United States v. Moore*, 446 F.3d 671, 681 (7th Cir. 2006); *see also United States v. Henry*, 164 F.3d 1304, 1308 & n.2 (10th Cir. 1999) (defining materiality in the context of 18 U.S.C. § 1920 as a statement that "has a natural tendency to influence, or was capable of influencing, the decision of the tribunal in making the determination required to be made" (quoting *United States v. Parsons*, 967 F.2d 452, 455 (10th Cir. 1992)).

[17] *See also United States v. Johnson*, 139 F.3d 1359, 1364 (11th Cir. 1998) ("Actual knowledge by the government is not a defense to the 'materiality' requirement of false statement prosecutions."); *United States v. Rogers*, 118 F.3d 466, 472 (6th Cir. 1997) (same); *United States v. LeMaster*, 54 F.3d 1224, 1230-31 (6th Cir. 1995).

ees was relevant to her intent; we further agree that the court could have been more specific by instructing that actual knowledge is not a defense *to the materiality element* of the Government's case. Nevertheless, when considered in their entirety, the court's instructions were not legally erroneous; nor did they misguide the jury so as to prejudice Ms. Webber. In all of its instructions during the trial, the court stated that evidence of actual knowledge by the witnesses would be relevant for "other purposes." R.86 at 543, 654. Moreover, it allowed Ms. Webber's counsel to argue repeatedly, during both opening and closing arguments, that Byron postal employees' actual knowledge of Clearview disproved the willfulness element of the Government's case. *See* R.83 at 34-35, 38-39; R.88 at 1022, 1032-33, 1049, 1051, 1056. During closing argument, for example, counsel stated: "Mr. Engstrom is [Ms. Webber's] employer. Don't you think, ladies and gentlemen, that if Vickie Webber is acting in a crooked, fraudulent capacity, don't you think that she would have hidden all that from her employer . . . ?" R.88 at 1033. Counsel further pointed out that Ms. Webber "put the [allegedly fraudulent] information on the form . . . kn[owing] full well that Mr. Engstrom knew otherwise" and asked, "Why in the world if [Ms. Webber is] a crook would she have done that?" *Id.* at 1022. Counsel's arguments, many of which post-dated the district court's allegedly overbroad instructions, made it clear to the jury that, although Ms. Webber's failure to conceal Clearview's existence from Byron postal employees was not relevant to the materiality element of the Government's case, it was relevant to her intent.

Finally, the district court instructed the jury on the use of circumstantial evidence. R.54 at 8 ("Circumstantial evidence is proof of a series of facts which tend to show

whether a defendant is guilty or not guilty. . . . All the evidence in the case, including circumstantial evidence, should be considered by you in reaching your verdict."). This instruction permitted the jury to consider Ms. Webber's candor about Clearview to Byron postal employees as relevant and probative of her intent. When considered in this context, the entirety of the district court's instructions fairly and accurately informed the jury of the governing legal principles.

## D. Restitution Order

Ms. Webber next submits that the district court erred in ordering her to pay $62,226.36 in restitution. R.77 at 6-7 (judgment). The proper measure of loss for purposes of restitution, she submits, is the difference between the amount of benefits that she actually was paid and the amount of benefits to which she would have been entitled absent the fraud, the same calculation employed by the sentencing guidelines. *See* U.S.S.G. § 2B1.1(b)(1) & cmt. 3(F)(ii). Although the district court determined that the amount of loss for guidelines purposes was $10,400, it nevertheless sentenced her to pay $62,226.36 in restitution. Ms. Webber contends that the court erred in importing a regulation, promulgated by the Secretary of Labor under 5 U.S.C. § 8149, into a criminal proceeding.

The Government concedes that the $62,226.36 restitution award, which was the *total* amount of FECA benefits that Ms. Webber received, exceeded the loss sustained by the Government as the victim of Ms. Webber's crime. *See* Appellee's Br. at 44-48. The Government, however, submits that the district court was authorized to impose such a restitution order under 5 U.S.C. § 8148 and 20 C.F.R.

§ 10.529. In support of this argument, the Government relies on *United States v. Harms*, 442 F.3d 367, 380-81 (5th Cir. 2006), although it recognizes that there is conflicting authority, *see* Appellee's Br. at 46 & n.18 (citing *United States v. Dawkins*, 202 F.3d 711, 715 (4th Cir. 2000)). According to the Government, "by ordering full restitution of $62,226.36, the district court did nothing more than enter the same judgment that the Department of Labor would have been entitled to in an administrative proceeding." Appellee's Br. at 48.

We review de novo questions of law regarding the federal courts' authority to order restitution, *see United States v. Farr*, 419 F.3d 621, 623 (7th Cir. 2005); we review for abuse of discretion a district court's calculation of restitution, taking the evidence in the light most favorable to the Government, *see United States v. Segal*, 495 F.3d 826, 837 (7th Cir. 2007).

**1.**

Our cases, as well as those of our sister circuits, set forth the well-established principle that "[f]ederal courts cannot order restitution in a criminal case without a statutory basis." *United States v. Pawlinski*, 374 F.3d 536, 540 (7th Cir. 2004); *United States v. Randle*, 324 F.3d 550, 555 (7th Cir. 2003); *see also United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996); *United States v. Snider*, 957 F.2d 703, 706 (9th Cir. 1992) (per curiam). An order of restitution that is imposed without a statutory basis is "illegal." *Pawlinski*, 374 F.3d at 540.

The statutes authorizing the district court to impose restitution, the Victim and Witnesses Protection Act ("VWPA"), 18 U.S.C. § 3663, and the Mandatory Victim

Restitution Act ("MVRA"), 18 U.S.C. § 3663A, authorize the imposition of restitution only for *losses* to the victim, here, the United States. *See also United States v. Frith*, 461 F.3d 914, 919 (7th Cir. 2006) (explaining that "[r]estitution orders are limited to: (1) losses caused by the specific conduct that is the basis of the offense of conviction; (2) losses caused by conduct committed during an offense that involves as an element a scheme, conspiracy, or pattern; and (3) restitution agreed to in a plea agreement" (internal quotation marks and citation omitted)). These statutes "require[] that [a] restitution award be based on the amount of loss *actually caused* by the defendant's offense." *United States v. Rhodes*, 330 F.3d 949, 953 (7th Cir. 2003) (emphasis in original).[18] Accordingly, "an order of restitution that exceeds the victim's actual losses or damages is an illegal sentence." *United States v. Wolf*, 90 F.3d 191, 194 n.2 (7th Cir. 1996); *cf. Hughey*, 495 U.S. at 413.

As we already have noted, the Government, although conceding that the $62,226.36 restitution award, the total amount of FECA benefits that Ms. Webber received, exceeded the loss sustained by the Government, attempts to defend the district court's action as authorized by 5 U.S.C. § 8148 and 20 C.F.R. § 10.529, a federal regulation implementing section 8148. Therefore, we begin with the

---

[18] *See also Virgin Islands v. Davis*, 43 F.3d 41, 44-45 (3d Cir. 1994); *United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir. 1993); *United States v. Diamond*, 969 F.2d 961, 967-68 (10th Cir. 1992); *United States v. Kenney*, 789 F.2d 783, 784 (9th Cir. 1986); *cf. Hughey v. United States*, 495 U.S. 411, 413 (1990) (holding that the Victim and Witness Protection Act "authorize[s] an award of restitution only for the loss caused by the specific conduct that is the basis of the offense of conviction").

language of this statute and regulation. Section 8148(a) provides:

> Any individual convicted of a violation of section 1920 of title 18, or any other Federal or State criminal statute relating to fraud in the application for or receipt of any benefit under this subchapter or subchapter III of this chapter, shall *forfeit* (as of the date of such conviction) any entitlement to any benefit such individual would otherwise be entitled to under this subchapter or subchapter III for any injury occurring on or before the date of such conviction. Such *forfeiture* shall be in addition to any action the Secretary may take under section 8106 or 8129.

5 U.S.C. § 8148(a) (emphases added). Federal regulation section 10.529 provides:

> (a) If an employee knowingly omits or understates any earnings or work activity in making a report, he or she shall *forfeit* the right to compensation with respect to any period for which the report was required. A false or evasive statement, omission, concealment, or mis-representation with respect to employment activity or earnings in a report may also subject an employee to criminal prosecution.
>
> (b) Where the right to compensation is *forfeited*, OWCP shall recover any compensation already paid for the period of forfeiture pursuant to 5 U.S.C. § 8129 and other relevant statutes.

20 C.F.R. § 10.529 (emphases added).

The plain language of section 8148(a) and its corresponding regulation establishes two principles. First, any employee who violates 18 U.S.C. § 1920 (or a similar criminal

provision) forfeits *all* of the benefits that he obtained during the period covered by the fraud. Second, section 8148(a) and its corresponding regulation are *forfeiture*, rather than restitution, provisions.

Forfeiture and restitution are distinct remedies. *United States v. Leahy*, 464 F.3d 773, 793 n.8 (7th Cir. 2006) ("[R]estitution and forfeiture serve different goals . . . ."). Restitution is remedial in nature, and its goal is to restore the victim's loss. *United States v. Browne*, 505 F.3d 1229, 1281 (11th Cir. 2007). Forfeiture, in contrast, is punitive; it seeks to disgorge any profits that the offender realized from his illegal activity. *Browne*, 505 F.3d at 1281. Given their distinct nature and goals, restitution is calculated based on the victim's loss, while forfeiture is based on the offender's gain. *See United States v. George*, 403 F.3d 470, 474 (7th Cir. 2005). Different adjudicatory procedures apply, moreover, depending on which of these remedies the Government is seeking. Of particular importance in this case, the Federal Rules of Criminal Procedure explicitly provide that "[n]o judgment of forfeiture may be entered in a criminal proceeding unless the indictment or the information provides notice that the defendant has an interest in property that is subject to forfeiture in accordance with the applicable statute." Fed. R. Crim. P. 7(c)(2); *see also* Fed. R. Crim. P. 32.2(1) ("A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute."). Additionally, a defendant, "in a case in which a jury returns a verdict of guilty," has a statutory right to have the jury "determine whether the government has established the requisite nexus between the property and the offense

committed by the defendant." Fed. R. Crim. P. 32.2(b)(4); *Libretti v. United States*, 516 U.S. 29 (1995). Restitution, however, has no comparable requirements. *See generally* 18 U.S.C. § 3664(c) (discussing the procedures required for the issuance of an order of restitution).

Despite these differences between forfeiture and restitution, the Government nevertheless maintains that section 8148 and its corresponding regulation, both of which by their plain language are forfeiture provisions, gave the district court the authority to impose on Ms. Webber an order of restitution that exceeded the actual loss to the Government. The Government relies on *Harms*, 442 F.3d at 380-81, a case in which the Fifth Circuit, pursuant to 20 C.F.R. § 10.529, affirmed an order of restitution in excess of the victim's losses. In *Harms*, a federal employee who had been convicted of violating 18 U.S.C. § 1920 appealed the district court's loss calculation under the sentencing guidelines as well as its restitution order. The district court had calculated the loss under the guidelines as the entire amount of benefits that the defendant had received; it imposed restitution in the same amount. The Fifth Circuit held that the loss calculation for sentencing guidelines purposes was the "difference between the amount the defendant actually received and the amount he would have received absent the fraud." *Harms*, 442 F.3d at 380. Despite this holding, the court affirmed the restitution order. *Id.* The court held:

> [W]e reject Harms's assertion that the district court erred in ordering restitution of all the benefits Harms received. The plain language of 20 C.F.R. § 10.529(a) provides that "[i]f an employee knowingly omits or understates any earnings or work activity in making a report, he or she shall forfeit the right to compensation with respect to any period for which the report is

required." *See also [United States v.] Brothers*, 955 F.2d [493,] 495 [(7th Cir. 2006)] ("If a claimant submits a false 1032 statement he forfeits the entire disability benefit even if he would have been entitled to a reduced benefit if he had submitted an accurate 1032 form."); *[United States v.] Dawkins*, 202 F.3d [711,] 714-15 [(4th Cir. 2002)] (distinguishing between amount of forfeiture for purposes of restitution and amount of loss for purposes of sentencing). Thus, the district court did not err in ordering restitution of all the benefits [the defendant] received.

*Id.*

Respectfully, we cannot agree with the holding of *Harms* that 20 C.F.R. § 10.529 authorizes a district court to impose *restitution* in an amount that exceeds the victim's loss. Notably, the Fifth Circuit in *Harms* did not take into account, as far as we can tell from the opinion, the notice requirements mandated by the Federal Rules of Criminal Procedure. As we have noted, the authority relied upon by the court, 20 C.F.R. § 10.529 (along with the corresponding statute, 5 U.S.C. § 8148(a)) is a forfeiture provision, a remedy distinct from restitution. Allowing the Government to use this provision to obtain a forfeiture under the guise of restitution would allow it improperly to circumvent the notice requirements of Rule 7(c)(2) and Rule 32.2(1). Furthermore, as support for its holding that 20 C.F.R. § 10.529 authorizes a district court to impose an order of restitution in an amount that exceeds the victim's loss, *Harms* relied on *Dawkins*, 202 F.3d at 715, a case that

reaches a contrary result.[19] *See Harms*, 442 F.3d at 380 (citing *Dawkins*, 202 F.3d at 714-15); *see also United States v. Petruk*, 484 F.3d 1035, 1038 & n.3 (8th Cir. 2007) (noting that *Harms* and *Dawkins* are inconsistent).

In *Dawkins*, the Fourth Circuit was presented with the same issue that arose in *Harms*. A district court had calculated the loss under the guidelines as the entire amount of benefits that the defendant had received, and it imposed restitution in the same amount. Although noting that "the Government may be entitled to collect [the entire amount of benefits] via forfeiture, *see* 20 C.F.R. § 10.529," the Fourth Circuit explained that the forfeiture amount was "not necessarily the measure of loss for sentencing purposes." *Dawkins*, 202 F.3d at 715. It held that, under a conviction for 18 U.S.C. § 1920, the proper measure of loss for guidelines purposes is "the difference between the amount of benefits [the defendant] actually received and the amount he would have received had he truthfully and accurately completed the 1032 forms." *Id.* Notably, the court then vacated the amount of restitution: "As we have ordered the district court to recalculate the loss amount on remand, and the restitution amount depends on the amount of loss, *see* 18

---

[19] *Harms* also cited our statement in *United States v. Brothers*, 955 F.2d 493, 495 (7th Cir. 2006): "If a claimant submits a false 1032 form he forfeits the entire disability benefit even if he could have been entitled to a reduced benefit if he had submitted an accurate 1032 form." Our decision in *Brothers* is not in conflict with our holding in this case. The court was not confronted with the issue of whether 5 U.S.C. § 8148 supports an order of restitution rather than one of forfeiture; we also note that the statement cited by *Harms* appears in the fact section of the opinion and appears not to have influenced directly the court's holding. *Brothers*, 955 F.2d at 495.

U.S.C. §§ 3663A(a)(1), (c)(1)(A)(ii), 3664(f)(1)(A), the district court will necessarily have to reconsider the matter of restitution." *Dawkins*, 202 F.3d at 715. The court thus declined to allow the Government, under the guise of 5 U.S.C. § 8148 and 20 C.F.R. § 10.529, to recover restitution in an amount that exceeded the victim's loss. This position conflicts with the Fifth Circuit's holding in *Harms*.

Therefore, we hold that 5 U.S.C. § 8148(a) and 20 C.F.R. § 10.529, being forfeiture provisions, do not provide an adequate basis to support a district court's order of *restitution* in excess of the victim's loss.

### 2.

We note, nevertheless, that the Government generally may seek a *forfeiture* order in a criminal proceeding pursuant to these provisions. Under 28 U.S.C. § 2461(c), "[i]f a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure." The statute further provides that, "[i]f the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." *Id.*; *see also United States v. Silvious*, 512 F.3d 364, 370 (7th Cir. 2007).

In this case, however, the Government may not rely on this statutory provision because the proper notification procedures were not followed. Rule 32.2 of the Federal Rules of Criminal Procedure provides that "[a] court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of

property as part of any sentence in accordance with the applicable statute." *See also* Fed. R. Crim. P. 7(c)(2). The indictment filed against Ms. Webber, *see* R.1, does not reference 5 U.S.C. § 8148, 20 C.F.R. § 10.529 or, for that matter, *any* forfeiture provision.[20]

Because the amount of restitution that the district court ordered Ms. Webber to pay exceeds the Government's losses, it constitutes an illegal sentence. *Pawlinski*, 374 F.3d at 540; *Randle*, 324 F.3d at 555. We therefore reverse the district court's order of restitution and remand the case for limited resentencing on the issue of restitution.[21]

---

[20] *See United States v. Silvious*, 512 F.3d 364, 370 (7th Cir. 2007) (holding that, although the indictment listed the wrong forfeiture statute, sufficient notice had been provided because the indictment informed the defendant that the Government intended to seek forfeiture and identified the targeted assets).

[21] Nothing in this opinion shall prevent the Department of Labor from instituting a civil forfeiture action, as permitted by 5 U.S.C. § 8148, 20 C.F.R. § 10.529 and other relevant authority, against Ms. Webber to recover the $62,226.36 that she obtained in FECA benefits.

**Conclusion**

For the foregoing reasons, we affirm Ms. Webber's conviction, and we reverse the district court's restitution order and remand the case for resentencing proceedings consistent with this opinion.

AFFIRMED in part;
REVERSED and REMANDED in part